[Civ. No. 1349.   Fourth Appellate District.—June 7, 1935.]

TAGUS RANCH COMPANY (a Corporation), Respondent, v. THE FIRST NATIONAL BANK OF CLOVIS (a National Banking Association), Appellant.

Arthur Frame and Frank Kauke for Appellant.

Russell & Heid for Respondent.

BARNARD, P. J.—A. A. Reed and Laura J. Reed were husband and wife. He operated a small sawmill in the mountains manufacturing shook and tray material. In July, 1932, he borrowed $600 from the defendant on his note and used the same to purchase a tractor and other machinery from a garage for use in connection with the sawmill. Apparently the bank acquired the legal title to this machinery from the garage and there is evidence that the garage took back the machinery from Reed, although the cashier of the bank testified that the bank never received it. In April, 1933, Reed entered into a contract with the plaintiff to supply to it certain trays. Thereafter he obtained from the bank a further loan in the sum of $250 on his note, for the purpose of purchasing additional machinery for the mill. He obtained a permit from the government to cut certain timber and moved his sawmill to a certain point in Fresno County. Before the mill was set up he disappeared, leaving his wife and child without means of support.

Laura J. Reed went to the defendant bank to inquire about her husband's affairs. Her testimony is that they told her little, that she knew the $250 note was there but that she thought the $600 note had been paid by the return of the machinery. She informed the bank of her husband's disappearance and that she intended to carry on the business in order.to make a living for herself and child. On June 14, 1933, she told the defendant she needed money for groceries and to carry on the business, and it loaned her $100 on her note. A new account was opened in her name and she was given a pass-book. A number of deposits were made in this account and a number of her checks were paid. About July 22, 1933, Mrs. Reed had an interview with the plaintiff as a result of which the plaintiff sent a check for $750.56 to the defendant bank, payable to Mrs. Reed. On July 24, 1933, Mrs. Reed went to the bank, expecting the check to be there, and indorsed and deposited the same to her account. She testified, as to the reason why this money was furnished to her, that she had to have a larger engine at the plant in order to put out this material for the plaintiff and also wanted to pay up some labor and other things which were behind in connection with the mill. She also testified that she told the bank that she had gotten this money in order to straighten out and go ahead with the mill.

Without saying anything to Mrs. Reed in advance, the bank, on July 28, 1933, took the $750.56 and applied the same on Mr. Reed's notes, sending Mrs. Reed a written notice that her account had been charged with that amount. Thereafter, Mrs. Reed assigned her claim to the plaintiff and this action was brought to recover the amount thus taken by the defendant. The court found that the said Laura J. Reed, while living separate and apart from her husband, had earned and accumulated the said sum of $750.56, that she deposited the same in the defendant bank in a separate account in her own name, that said fund was and is the separate property of the said Laura J. Reed and that she was not liable for any indebtedness of her husband. From the judgment entered, the defendant has appealed.

The appellant contends that the findings to the effect that this money was Mrs. Reed's separate property and not the community property of herself and her husband are not

sustained by the evidence. In support thereof, *Schuyler* v. *Broughton,* 70 Cal. 282 [11 Pac. 719], and other cases, are cited, in which it has been held that where money is borrowed by a married woman and invested in real estate and where the same is not secured by a lien on her separate property, the real property bought is community property. These cases are not very helpful here. Section 169 of the Civil Code provides that the earnings and accumulations of a wife, while living separate from her husband, are her separate property. In *Union Oil Co.* v. *Stewart,* 158 Cal. 149 [110 Pac. 313, Ann. Cas. 1912A, 567], the court said:

"But when he has left his family, has ceased to contribute to its support, and has abandoned his property to the use of his wife for that purpose, there is no consideration of .public policy which prevents her from exercising the same powers and acquiring the same rights with respect to the property left in her hands as if she were an unmarried person. Our liberal statutes concerning the rights and powers of married women invest her with sufficient power to hold adversely to her husband. She may own, hold, and control her separate property, as fully and completely as the husband can own and control his separate property. (Civ. Code, sec. 162.) Neither spouse has any interest in the separate property of the other. (Civ. Code, sec. 157.)" In that case, which involved a claim of adverse possession on the part of the wife as against the husband, the court, in discussing section 169 of the Civil Code, said:

"The word 'earnings' according to its ordinary meaning, would not apply to property acquired by adverse possession. But property so acquired and held in ownership would clearly be included in the term 'accumulations'. When one speaks generally of accumulation of property, he is understood to refer to any property which a person acquires and retains, without regard to the means by which it is obtained. Of course if it were acquired by the wife by purchase with community funds, or in exchange for other community property, it would not be accumulated in the sense here involved. Such an acquisition would be a mere exchange and it would have the character possessed by that given in exchange for it. But where the wife, while living separate from her husband, through her own industry, labor, skill, or efforts of any kind, obtains property and holds it in possession, it is what would

ordinarily be called an accumulation of property, and, under the rules stated in section 169, it would be a part of her separate estate.''

It fully appears that Mrs. Reed was deserted by her husband and left without means of support for herself and child except for such property as there might have been in connection with the sawmill, which was in an involved state, to say the least. With the knowledge of the bank and with its consent, express or implied, Mrs. Reed made an entire change in the set-up and proceeded to try to operate the mill in order to make a living and in order to fulfill the contract which her husband had made with the respondent. She borrowed money from the bank and started a new account in her name, she procured a new contract from the respondent in place of the one her husband had held, she obtained a new permit to cut timber from the government in her name, she moved the sawmill, which had not been set up at the former place, to a new location in accordance with the new permit, and she operated the plant and delivered trays to the respondent under the new contract. Needing some cash with which to operate, she went to the respondent and secured this $750.56, the check being made payable to her and sent to the bank. While the appellant's cashier testified that when he loaned her the $100 upon her note something was said to the effect that checks received from the respondent should be applied by the bank on all of the notes, including those given by her husband, this was denied by Mrs. Reed, who testified that at that time she told him that as checks came in from the respondent he could apply a percentage of the same upon her $100 note until the same was paid. It is significant in this connection that some half dozen checks came to the bank from the respondent, payable to Mrs. Reed, which she signed and deposited to her account, and that they took nothing from these smaller checks to apply on any note until this large check came in, when they took it all. Although nothing was said to her at the time she signed this check and deposited it in her account, four days later her account was charged with the amount of the check and payment was refused on checks which she had issued.

While Mrs. Reed stated in one part of her testimony that she borrowed this amount from the respondent, the court was justified in inferring from the entire testimony, and in

fact it is the only reasonable inference that can be drawn therefrom, that this amount was paid by the respondent· to Mrs. Reed as an advance in order to enable her to furnish the trays in accordance with the contract. The bank had full knowledge of all of this and in fact encouraged her to go ahead with her arrangements to operate the plant and assisted her in doing so, and immediately after she secured this money which would have enabled her to proceed, it was all taken and applied to her husband's debts, making it impossible for her to go on or to complete the very contract for which the money was advanced and through which it was obtained. To permit the bank to keep this money is neither in accord with justice nor required by any rule of law. If this money was not earned by Mrs. Reed it is at least such an accumulation as comes within the code section and, in our opinion, the essential findings are supported by the evidence. (*Union Oil Co.* v. *Stewart, supra; Street* v. *Bertolone,* 193 Cal. 751 [226 Pac. 913].)

■ Some claim is made that Mrs. Reed was acting merely as the agent of her husband in this transaction. There was no presumption to this effect, no proof of such a fact was offered although the burden rested upon the appellant (*Schwarze* v. *Mahoney,* 97 Cal. 131 [31 Pac. 908]), and the evidence justified the court in arriving at a contrary conclusion.

■ In its final brief the appellant for the first time raises the point that the evidence does not sufficiently show that Mrs. Reed was, during the time in question, living separate and apart from her husband. Not only is the point raised too late, but the undisputed evidence to the effect that her husband had disappeared, that he had never been heard from, that she had searched for him and had never been able to find him, and that he was still missing at the time of the trial, with the reasonable inferences therefrom, is sufficient to support the finding.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.