Filed 7/20/15

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| In re Marriage of SHERYL JONES DAVIS and KEITH XAVIER DAVIS. _____ | ) ) ) ) | |
| SHERYL JONES DAVIS, | ) ) ) | S215050 |
| Respondent, | ) ) | |
| v. | ) ) | Ct.App. 1/1 A136858 |
| KEITH XAVIER DAVIS, | ) ) | Alameda County Super. Ct. No. RF08428441 |
| Appellant. _____ | ) ) ) ) | |

In a marital dissolution proceeding, a court determines the division of property between the spouses by first characterizing the parties' property as community property or separate property. (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399.) Family Code section 760 provides that all property acquired by the spouses during the marriage is community property "[e]xcept as otherwise provided by statute." One such statute is Family Code section 771, subdivision (a) (section 771(a)), which provides that "[t]he earnings and accumulations of a spouse . . . , while living separate and apart from the other spouse, are the separate property of the spouse." In this case we consider whether a couple may be "living separate and apart," for purposes of section 771(a), when they *live together* in the same home. We conclude the answer is no. The statute requires the spouses to be

living in separate residences in order for their earnings and accumulations to be their separate property. Because the Court of Appeal concluded otherwise, we reverse its judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND

Keith Xavier Davis (husband) and Sheryl Jones Davis (wife) were married on June 12, 1993. They have two children, a daughter born in August 1995 and a son born in November 1999. Wife filed for dissolution on December 30, 2008.

At trial on the issue of the date of their separation, wife described the couple's marriage as turbulent. She testified that they stopped being sexually intimate after their son was conceived in 1999. They never went on a "date" after their son was born. The parties disagreed as to when they stopped sharing a bedroom in their marital home. Husband testified wife moved to another bedroom in 2001; wife testified this happened in 2004. Their trial testimony indicates that they both attended the children's activities, but traveled to the locations by separate cars. Wife did her own and the children's laundry. Husband did his laundry. Both parties prepared meals, but wife would not prepare something different for husband if he was dissatisfied with the meal she made for herself and the children. The parties took some family vacations together, but also took separate vacations. In deposition testimony, wife claimed that by 2004 they were "living entirely separate lives." They spoke about divorce, but stayed together for the sake of the children.

The parties maintained a joint bank account from the beginning of their marriage, which wife managed. In 2001, however, husband started his own business and at some point opened a separate bank account. In 2003, wife reactivated a separate bank account of her own to manage her business funds and pay for her personal expenses. Husband contributed $3,200 a month to the parties' joint account from his separate account for the payment of household

2

expenses. But both parties were unhappy with each other's contributions to the joint account. In January 2006, husband became employed by Clorox, substantially increasing his earnings. Wife was frustrated when he did not increase his financial support to the household.

On June 1, 2006, after the end of their son's school year, wife announced to husband that she was "through" with the marriage. According to her, the "last component" of their marriage was their finances. On June 1, 2006, wife presented husband with a financial ledger that itemized their joint household expenses and their individual expenses. She did this because she wanted the parties to contribute equally to running the home and funding the children's expenses, while being solely responsible for their own respective personal expenses. Wife removed husband from her American Express credit account and returned several of husband's credit cards to him. She believed at this point that they were acting simply as roommates. In July 2006, wife began working full-time, substantially increasing her earnings. Husband left his job with Clorox in September 2006.

The parties continued to live in the marital home after June 1, 2006. Wife continued to keep her personal belongings there. She continued to receive mail and telephone calls there. She continued to cook meals at the home when she was in town, although she often traveled for her work. She did not change the address on her driver's license. In August 2006, the parties took a family vacation to Hawaii with their children. However, they subsequently took no out-of-state vacations with one another. They continued to celebrate special occasions, such as birthdays and holidays, together as a family as they had previously done. They both continued to use their joint bank account.

When wife filed the petition for dissolution of the marriage on December 30, 2008, she listed the date of their separation as June 1, 2006. In his initial response to wife's petition, husband listed the date of separation as

3

January 2, 2009 (a few days after wife's filing of the petition). Wife did not move out of the marital home until July 2011. Husband subsequently filed an amended response listing the date of separation as July 1, 2011.

After trial of the issue, the court found the date of separation to be June 1, 2006. The Court of Appeal affirmed. In relevant part, it disagreed with the majority decision in *In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152 (*Norviel*), which held that physically living apart is "an indispensable threshold requirement" for separation under section 771(a). (*Norviel, supra*, at p. 1162.) We granted review to resolve the apparent conflict in interpretation of the statute.

## II. DISCUSSION

### A. *Contentions of the parties and standard of review*

Husband contends that spouses cannot be "living separate and apart" for purposes of section 771(a) when they continue to share a residence. He urges such a bright-line rule in order to provide clear guidance to judges and a measure of predictability to attorneys and litigants. Wife contends that no particular fact, including place of residence, is determinative. Instead, wife argues that a court should consider the totality of the circumstances and decide the date of separation based on conduct by either or both of the spouses evidencing a complete and final intent to part ways with no plan of resuming the marital relationship, even if at that time they are still living in the same residence. According to wife, husband's proposed bright-line rule is unworkable and would lead to harsh results. Husband claims the same thing about wife's proposed rule.

Although the date of separation is normally a factual issue to be reviewed for substantial evidence (*In re Marriage of Manfer* (2006) 144 Cal.App.4th 925, 930 (*Manfer*)), resolution of the opposing contentions here depends on statutory construction of the language of section 771(a), a question of law to which we

4

apply a de novo standard of review.  (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1119.)

## B.  *Statutory construction of section 771(a)*

Section 771(a) is part of California's statutory community property scheme, a system of law that "originated in continental Europe, came to Mexico from Spain, and became California law through the treaty of 1848."  (11 Witkin, Summary of Cal. Law (10th ed. 2005) Community Property, § 1, p. 529; see *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 12.)  In interpreting the language of section 771(a), as with all questions of statutory construction, "our objective 'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " (*Ceja v. Rudolph & Sletten, Inc.*, *supra*, 56 Cal.4th at p. 1119.)  This principle is especially important in construing a statute within the community property scheme because the system itself is a "creature of statute."  (1 Bassett, Cal. Community Property Law:  A Treatise on Marital Property Rights (3d ed. 1994) Origins & Development, § 1:4, p. 8 (Bassett).)

" 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

5

### 1. *The plain meaning of "living separate and apart"*

As noted earlier, section 771(a) states that "[t]he earnings and accumulations of a spouse . . . , *while living separate and apart from the other spouse,* are the separate property of the spouse." (Italics added.)

In considering whether this statute has a plain meaning, we recognize that "the phrase 'living separate and apart' is a term of art." (1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2014) Characterization — Division in General, § 20.06[2][a], p. 20-26.) As such, it has been defined in Black's Law Dictionary as spouses "*residing in different places* and having no intention of resuming marital relations" (Black's Law Dict. (7th ed. 1999) p. 945, col. 2, italics added) and more recently as spouses "*living away from each other*, along with at least one spouse's intent to dissolve the marriage." (Black's Law Dict. (10th ed. 2014) p. 1076, col. 2, italics added.) These definitions contemplate both a physical separation of residence *and* an accompanying intent to end the marital relationship. They incorporate an ordinary and common linguistic understanding of the word "apart," used as an adverb, as being "[a]t a distance in place, position, or time" or "[a]way from" and the word "separate" as denoting being "ke[pt] apart," "space[d] apart" or "scatter[ed]." (Amer. Heritage Dict. (4th ed. 2000) pp. 82, col. 2, 1587, col. 1; accord, Webster's 3d New Internat. Dict. (2002) p. 98, col. 2 [defining "apart" as "at a ' "distance," "separate[] in space or time"].)[1]

Indeed, both legal usage of the phrase "living separate and apart" and colloquial understanding of what it means for someone to live "separate" and

---

[1] Although not binding, it can be useful to refer to the dictionary definition of a word in attempting to ascertain the meaning of statutory language. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122; *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649.)

"apart" from someone else do not include persons living together in the same home. Ordinary usage of the language itself contemplates the parties' occupation of separate residences. Therefore, the statute on its face appears to have a commonly understood, plain meaning.

Nevertheless, we recognize that the phrase as used in section 771(a) is not without at least some ambiguity. The phrase "living separate and apart" could less likely, but still plausibly, be read to mean that the spouses are in effect "living separate lives" with the requisite intent to end the marital relationship. (See Webster's 3d New Internat. Dict., *supra*, p. 2069, col. 3 [defining the adjective "separate" as "not shared with another," "existing by itself: autonomous, independent" or "distinct, different"].) Such an interpretation would not require separate residences for purposes of section 771(a). Instead, it would focus a court's attention on the spouses' independence or autonomy from each other in their daily living. Under this understanding of the statutory phrase, physical separation would, as wife contends, be simply one of many factors to consider in determining the date of a couple's separation.

To consider whether the Legislature intended the language of section 771(a) to encompass this less likely, but still possible secondary meaning, we turn to extrinsic aids — the statute's long history, its prior judicial construction, and the Legislature's use of the phrase elsewhere in the Family Code — to consider what light they may shed on the Legislature's intent. We find evidence there bolstering the ordinary and common meaning of the language as requiring separate residences along with demonstrated intent to finally end the marital relationship before a spouse's earnings and accumulations are considered that spouse's separate property.

7

## 2. *Consideration of extrinsic aids*

The language of section 771(a) originated in a predecessor statute that was enacted 145 years ago in 1870.  (Stats. 1870, ch. 161, p. 226, entitled "An Act to protect the rights of married women in certain cases" — hereafter the 1870 Act.)  In its first section, the 1870 Act provided that "the earnings of [a] wife" were "not liable for the debts of [her] husband."  (1870 Act, Stats. 1870, ch. 161, § 1, p. 226.)  More significantly for our purposes, in language identical to section 771(a) except for the original text's restriction to wives, the 1870 Act provided that "[t]he earnings and accumulations of the wife . . . , while the wife is living separate and apart from her husband, shall be the separate property of the wife."  (*Id.*, § 2, p. 226.)  Further, the 1870 Act specified that a wife "living separate and apart from her husband" had "sole and exclusive control [over] her separate property," could "sue and be sued," without joinder of her husband, and could "avail herself of and be subject to all legal process in all actions, including actions concerning her real estate."  (*Id.*, § 3, p. 226.)

The 1870 Act did not contain a definition of the phrase "living separate and apart" used in section 2.  (Stats. 1870, ch. 161, § 2, p. 226.)  However, the Legislature's understanding that the phrase connoted a threshold requirement of separate residences may be discerned from an additional section of the statute.  Section 4 of the 1870 Act provided a procedure for a wife who was "living separate and apart" from her husband to sell her real property without joining with her husband.  To do so, the wife was required to record a verified and acknowledged declaration "containing a description of such real estate, the name of her husband, *her own place of residence*, and [stating] that she is a married woman, *living separate and apart from her husband.*"  (1870 Act, Stats. 1870, ch. 161, § 4, p. 226, italics added.)  The statutory requirement that the wife state in a declaration "her own" place of residence that is "separate and apart from her

8

husband" strongly suggests that the 1870 Act was directed at a situation where the spouses had physically separated and the wife in fact *had* "her own" residence. It is some indication that the 1870 Legislature had in mind what we have described as the common meaning of the language when it first adopted it.

In this regard, we find it additionally helpful to recall the historical context of the 1870 Act. At that time, married women had very limited power over their property. In the absence of a binding premarital agreement, the husband had the absolute right of "management and control" of the community property of the marriage, including the power of sale of assets. (Stats. 1850, ch. 103, §§ 9, 14, pp. 254-255.) Under the original 1850 statute defining spousal property rights, the "rents and profits of the separate property" of both husband and wife were deemed community property and were, therefore, under the exclusive control of the husband. (*Id.*, § 9, p. 254.) In addition, the husband had the "right of management and control" of the wife's separate property "during the continuance of the marriage." (*Id.*, § 6, p. 254.) Her protection against her husband's inappropriate sale of her separate property "during the continuance of the marriage" lay in a procedural requirement that the sale or encumbrance must be in an instrument in writing signed by both husband and wife, and her protection against her husband's general mismanagement of her separate property during the marriage lay in an application to the court for the appointment of a trustee to act on her behalf. (*Id.*, §§ 6, 8, p. 254.)

Between 1850 and 1870, the Legislature recognized a few circumstances under which a married woman could have some control over her separate property. By legislation in 1852, a married woman was given authority to run a business in her own name under limited circumstances as a "sole trader" and under such circumstances, could retain the earnings of such a business as her separate property; they were not subject to the debts of her husband and she had the

9

authority to sue her debtors.  (See Bassett, *supra,* § 1:3, at pp. 6-7.)  By legislation in 1853, if the terms of an instrument bequeathing, devising or gifting property to the wife provided that the rents and profits were to "be applied to her sole and separate use," the wife could manage and dispose of such rents and profits.  (Stats. 1853, ch. 116, § 1, p. 165.)  Legislation adopted in 1855 gave a married woman whose husband was absent from the state for a year the right to convey her separate property real estate (Stats. 1855, ch. 17, § 1, p. 12), but apparently not any other property left in her possession.  (See Prager, *The Persistence of Separate Property Concepts in California's Community Property System, 1849-1975* (1976) 24 UCLA L.Rev. 1, 39-41 (Prager); Stats. 1852, ch. 42, p. 101.)

Nevertheless, under the statutory scheme in effect in 1870, until entry of a decree of dissolution of the marriage (Stats. 1850, ch. 103, § 12, p. 255 [requiring a division of a couple's community property in the decree of dissolution]), it appears that a woman who was either involved in divorce proceedings or whose husband had deserted or otherwise left her, and who did not have separate property coming within one of the statutory provisions giving her control over it, would have no right of access to the financial sustenance needed to meet the expenses of daily life on her own.  Commentators have observed that the law's restrictive provisions at this time were to some extent inconsistent with traditional principles of community property law — principles that actually afforded more legal protection to women than did the common law principles that seem to have filtered into the California system.  (See Prager, *supra*, 24 UCLA L.Rev. at pp. 34-46; see also Cammack, *Marital Property in California and Indonesia: Community Property and Harta Bersama* (2007) 64 Wash. & Lee L.Rev 1417, 1431-1433; Schuele, *Community Property Law and the Politics of Married Women's Rights in Nineteenth Century California* (1994) 7 W. Legal His. 245, 262-264; Bassett, *supra,* § 1:3, at pp. 7-8.)

10

When read as a whole and in this context, it seems evident that the 1870 Act was intended to afford married women some additional protection from the rigors of the law generally denying them control over their earnings and separate property. Under the authority of the 1870 Act, a wife whose husband was not physically living with her could undertake to support herself in her "own" residence. Unlike other married women, she could retain her earnings and accumulations as her separate property to maintain her separate residence. She was given the right to control and dispose of her separate property. She could sue and be sued without the joinder of her husband. Nothing in the 1870 Act indicates a different intent — to characterize a wife's earnings and accumulations as her separate property while she was still physically living with her husband in the marital home so long as she and her husband were sufficiently leading "separate lives." To the contrary, the 1870 Act should be understood as a limited exception to the general rule of that time that the husband had full management and control over the marital and separate assets for the duration of the marriage. It appears the Legislature was concerned only with the special and limited circumstance of a wife who was living physically separate from her husband. Such a wife was likely to be incurring separate expenses associated with her separate residence and could be anticipated to need the authority to separately maintain, control and manage such property. In such a situation, the 1870 Legislature determined an exception to the normal community property characterization of earnings and accumulations acquired during marriage and husband's control was appropriate.

When the Legislature adopted the Civil Code in 1872, it enacted a version of section 2 of the 1870 Act as Civil Code section 169 (former section 169). As enacted in 1872, former section 169 provided that "[t]he earnings and accumulations of the wife . . . , while she is living separate from her husband, are the separate property of the wife." (Civ. Code, § 169, as adopted 1872.) Again,

11

nothing suggests that the 1872 Legislature contemplated that anything other than separate residences would qualify as "living separate," i.e., that it intended the language to be construed differently from its common and ordinary meaning. In fact, the Legislature enacted at the same time section 5 of the Civil Code, which states that "[t]he provisions of this Code, so far as they are substantially the same as existing statutes or the common law, must be construed as continuations thereof, and not as new enactments." Because former section 169 was substantially the same as section 2 of the 1870 Act, Civil Code section 5 directs that it be interpreted as continuing in effect the former law.

Moreover, it might reasonably be suggested that the lack of a statutory definition of the phrase is some indication itself that the Legislature intended the ordinary meaning to apply. Otherwise, the Legislature would likely have provided a specialized definition of the term. It did not.

And indeed, with respect to the language now found in section 771(a), from the earliest cases on, the issue presented regarding the interpretation of the statute was not whether separate places of residence were a prerequisite for application of the law, but rather whether separate residences *sufficed*. That question was answered in the negative.

For example, in 1874, this court held that the 1870 Act did not apply when the evidence showed that the wife was only temporarily physically separated from her husband. We concluded that for the wife to be " 'living separate and apart' " within the meaning of the statute "[t]here must have been an abandonment on the part of the husband or wife, or a separation which was intended to be final." (*Tobin v. Galvin* (1874) 49 Cal. 34, 36-37.)

On the other hand, a husband and wife were living separate and apart within the meaning of former section 169 where the husband left his wife, lived in a separate town, and determined during his absence that he would never resume

12

marital relations with his wife, while his wife and children continued to live in the marital home, where the wife kept boarders and did other work to support herself and the children.  (*Loring v. Stuart* (1889) 79 Cal. 200, 201-202; see *Tagus Ranch Co. v. First Nat. Bk.* (1935) 7 Cal.App.2d 457 [money borrowed by wife who had been deserted by her husband constituted her separate property under former section 169].)  These facts illustrate the apparent purpose of the statute: to provide for an estranged wife, whose husband was not physically living with her, a means of maintaining herself in her separate place of residence by allowing her earnings and accumulations to be her separate property.

Without questioning whether separate residences was a necessary predicate, courts struggled to articulate a uniform standard for determining the date of separation in circumstances where the parties had moved into separate homes.

The court in *Makeig v. United Security Bk. & T. Co.* (1931) 112 Cal.App. 138 (*Makeig*), for example, summarized the then-existing law and concluded that "[l]iving separate and apart . . . , as contemplated by section 169, does not apply to a case where a man and wife are *residing temporarily in different places* due to economic or social reasons, but applies to a condition where the spouses have come to a parting of the ways and have no present intention of resuming marital relations and *taking up life together under the same roof*."  (*Id.*, at p. 143, italics added.)  The court explained that "[u]nder modern conditions there is many a man living and working in one place and his wife living and working in another, seeing one another only on week ends, sometimes not for months at a time, yet they are not living separate and apart within the meaning of the section, for there has been no marital rupture, and there is a present intention to live together as man and wife, and their status is only temporary, although it may happen that the condition might exist for some years."  (*Id.*, at pp. 143-144; accord, *Kerr v. Kerr* (1960) 182

Cal.App.2d 12, 18 [evidence showed that there was no final parting of the ways or intention not to resume marital relations under the same roof until such time as wife refused to permit husband's return to their home].)

Subsequent legislative developments suggest no intent to change the meaning of the phrase "living separate and apart." In 1969, the Legislature repealed the family law portions of the Civil Code and replaced them with the Family Law Act. (Stats. 1969, ch. 1608, §§ 3, 6, 8, pp. 3313-3314.) Relevant to our discussion, former section 169 was repealed and Civil Code section 5118 (former section 5118) was adopted. (Stats. 1969, ch. 1608, § 8, p. 3340.) Like its predecessor, former section 5118 provided that "[t]he earnings and accumulations of the wife . . . , while she is living separate from her husband, are the separate property of the wife." (Stats. 1969, ch. 1608, § 8, p. 3340.) As before, no specialized definition of the language was provided, and by enacting language identical to former section 169, the 1969 Legislature once again expressed its intent to continue in effect the former law. (Civ. Code, § 5.) Therefore, as it did originally, the statute continued to address the situation in which a wife was living estranged in a separate residence from her husband.

We pause at this point to observe that by this time the Legislature had also used the phrase "living separate and apart" elsewhere in the Civil Code. Civil Code former section 34.6 specified certain circumstances under which "a minor 15 years of age or older who [was] living separate and apart" from his or her parents or legal guardian, "whether with or without the consent of a parent or guardian and regardless of the duration of *such separate residence*," could consent to his or her own medical or dental care. (Civ. Code, former § 34.6, added by Stats. 1968, ch. 371, § 1, p. 788, italics added.) Former section 34.6 was repealed in 1992 (Stats. 1992, ch. 163, § 2, p. 724), but its substance was restated in Family Code section 6922, where it continues to use the phrase "living separate and apart" to

14

mean the minor occupies a separate residence.  (Fam. Code, § 6922, subd. (a)(2); see Family Code, 22 Cal. Law Revision Com. Rep. (1992) foll. § 6922, p. 545 ["Section 6922 restates former Civil Code § 34.6 without substantive change."].)  This statute further supports our view that the Legislature likely intends the common meaning of the language when it uses this statutory phrase.

Returning to the predecessor statutes to section 771(a), we note that in 1971, the Legislature amended the Family Law Act to address an inequity that had developed in the treatment of husbands and wives.  (Assem. Com. on Jud., Analysis of Assem. Bill No. 1549 (1971 Reg. Sess.) May 10, 1971.)  By this time, under Civil Code former section 5119, the earnings and accumulations of either spouse became the separate property of such spouse after rendition of a judgment of legal separation.  (Civ. Code, former § 5119, subd. (a), added by Stats. 1969, ch. 1608, § 8, p. 3340.)  In addition, the earnings and accumulations of a husband became his separate property after rendition of an interlocutory judgment of dissolution and while he was living separate and apart from his wife.  (Civ. Code, former § 5119, subd. (b), added by Stats. 1969, ch. 1608, § 8, pp. 3340-3341.)  But under former section 5118, the earnings and accumulations of a wife while she was living separate from her husband were her separate property regardless of whether an interlocutory judgment of dissolution had been rendered.  (Former § 5118, added by Stats. 1969, ch. 1608, § 8, p. 3340.)  In 1971, the Legislature repealed subdivision (b) of former section 5119 and amended former section 5118 to provide equal treatment by specifying that "[t]he earnings and accumulations of a *spouse . . . , while living separate and apart from the other spouse*, are the separate property of the *spouse*."  (Stats. 1971, ch. 1700, pp. 3639-3640, italics added.)  Nothing in the legislative history, however, indicates any intent to change

15

the original (and commonly understood) meaning of the phrase "living separate and apart."**2** Rather, the focus was simply on equalizing the treatment of husbands and wives. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 588 [The Legislature's purpose in amending the statute was likely to address its possible constitutional infirmity as gender discrimination.].)

The post-1971 cases continued to refine the description of what was necessary for application of former section 5118. But again, none of them questioned that a threshold requirement was separate residences. In *In re Marriage of Baragry* (1977) 73 Cal.App.3d 444 (*Baragry*), the appellate court reversed a trial court's determination that the parties had separated on the date that the husband moved out of the marital home. (*Id.*, at p. 449.) The reviewing court observed that the fact that husband and wife lived in separate residences was not determinative of whether they were "living separate and apart" for purposes of former section 5118. The court stated: "The question is whether the parties' conduct evidences a complete and final break in the marital relationship." (*Baragry, supra*, at p. 448.) It found no such conduct in the case before it because the husband maintained continuous and frequent contact with his family after moving from the marital home. He continued to eat dinner at the home, maintained his mailing and voter registration address at the home, sent his wife

___

**2**     The 1870 Act used the phrase "living separate and apart from her husband." (1870 Act, Stats. 1870, ch. 161, § 1, p. 226.) Former section 169 in 1872 and former section 5118 in 1969 both used the phrase "living separate from her husband." The 1971 amendment to former section 5118 restored the phrase "living separate and apart." (Stats. 1971, ch. 1700, § 1, p. 3640.) The difference in wording has not been considered significant. (Bruch, *The Legal Import of Informal Marital Separations: A Survey of California Law and a Call for Change* (1977) 65 Cal. L.Rev. 1015, 1020, fn. 11, and cases cited therein.)

16

cards and gifts, took her to social occasions, had her do his laundry, and otherwise maintained the appearance of being married. He never informed his wife that he had no intention of reconciling. (*Id.*, at pp. 447-448.)

Similarly, a reviewing court concluded the evidence supported a determination that a husband and his wife were not "living separate and apart" under former section 5118 even though the wife had moved out of the marital home, in a case in which they continued their sexual relationship, sought marriage counseling and made multiple efforts at reconciliation. (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 432-435.)

In *In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647 (*Umphrey*), another case in which the spouses were living in separate residences, the Court of Appeal cautioned that in determining the date of separation for purposes of former section 5118, courts are "duty bound to consider all of the relevant evidence" regarding " 'whether the parties' conduct evidences a complete and final break in the marital relationship.' " (*Umphrey, supra*, at p. 657, quoting *Baragry, supra,* 73 Cal.App.3d at p. 448.) It concluded that the parties' stipulation to a separation date after they physically moved apart was not conclusive. (*Ibid.*)

In 1989, the Legislature directed the Law Revision Commission to organize disparate statutes into a Family Code. (Family Code, 22 Cal. Law Revision Com. Rep., *supra*, p. 7.) In 1992, the Legislature enacted the Family Code, operative January 1, 1994. In pertinent part, the language of former section 5118 was placed into Family Code section 771. (Stats. 1992, ch. 162, § 10, p. 489.) The Law Revision Commission comment to section 771 states that "[s]ection 771 continues . . . Civil Code [former] [s]ection 5118 without change." (Family Code, 22 Cal.

17

Law Revision Com. Rep., *supra*, com. foll. § 771, p. 137; see also Cal. Law Revision Com. com., 29C West's Ann. Fam. Code (2004 ed.) foll. § 771, p. 405.)[3]

In 1994, the issue of the proper construction of the phrase "living separate and apart" was again before the court in *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730 (*von der Nuell*). The *von der Nuell* court concluded that the trial court erred in holding the date of separation of the parties was the date the husband moved out of the family residence even if the parties had, at that time, no intent to resume marital relations. (*Id.*, at p. 732.) The court held that "legal separation requires not only a parting of the ways with no present *intention* of resuming marital relations, *but also*, more importantly, *conduct* evidencing a complete and final break in the marital relationship." (*Id.*, at p. 736, italics changed.) By requiring both subjective intent and demonstrated conduct, the *von der Nuell* court essentially combined the requirements of *Makeig, supra,* 112 Cal.App. at p. 143 and *Baragry*, *supra*, 73 Cal.App.3d at p. 448. (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 451 (*Hardin*) [making this observation].) Pointing to evidence of the parties' attempts to reconcile, the *von der Nuell* court found that it was not until some years after the couple separated physically that their conduct evidenced the complete and final break in their marital relationship that was necessary to constitute "living separate and apart." (*von der Nuell*, *supra*, at pp. 732, 734-737.)

In *Hardin*, *supra*, 38 Cal.App.4th 448, the Court of Appeal likewise reversed a trial court's finding that the parties had separated on the date that husband moved out of their residence. Like the court in *von der Nuell*, the *Hardin*

---

[3]     In 1999, the language of section 771 was designated section 771(a) without change. (Stats. 1999, ch. 940, § 1, p. 6859.)

18

court concluded that both subjective intent to end the marriage and objective conduct demonstrating such intent is necessary for legal separation. (38 Cal.App.4th at p. 451.) "Simply stated, the date of separation occurs when either of the parties *does not* intend to resume the marriage *and* his or her actions bespeak the finality of the marital relationship. There must be problems that have so impaired the marriage relationship that the legitimate objects of matrimony have been destroyed and there is no reasonable possibility of eliminating, correcting or resolving these problems." (*Ibid*.) The court declared that "[a]ll factors bearing on either party's intentions 'to return or not to return to the other spouse' are to be considered," but "[n]o particular facts are per se determinative." (*Id.*, at p. 452.) "The *ultimate question to be decided in determining the date of separation is whether either or both of the parties perceived the rift in their relationship as final*. The best evidence of this is *their words and actions*. The husband's and the wife's subjective intents are to be objectively determined from all of the evidence reflecting the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final." (*Id.*, at p. 453.)[4]

---

[4]    The reviewing court in *Manfer*, *supra*, 144 Cal.App.4th 925, found *Hardin*'s articulation of the standard for determining the date of separation to be the most helpful. In *Manfer*, the husband moved out of the marital home and wife decided that their stormy marriage was finally over, but the parties agreed to hide their circumstances from family and friends until after the year-end holidays. The Court of Appeal held that the trial court "erroneously applied an 'outsider's viewpoint' standard to defer the date of separation to [a date] after the parties had revealed to the world their hitherto secret that the marriage was over." (*Id.*, at p. 927.) The *Manfer* court stated that "[t]he date-of-separation test does not ask what the public thinks, but whether at least one of the parties intended to end the marriage and whether there was objective conduct 'bespeak[ing] the finality of the marital relationship.' " (*Id.*, at p. 928.) Once again, as in all the other cases discussed previously, the facts in *Manfer* involved the separation of residences.

In our view, the language in these cases — requiring consideration of "all of the relevant evidence" regarding " 'whether the parties' conduct evidences a complete and final break in the marital relationship' " (*Umphrey, supra,* 218 Cal.App.3d at p. 657, quoting *Baragry, supra,* 73 Cal.App.3d at p. 448), requiring both a lack of "present intention of resuming marital relations . . . [and] conduct evidencing a complete and final break in the marital relationship" (*von der Nuell, supra,* 23 Cal.App.4th at p. 736, italics omitted), and indicating that "[a]ll factors . . . are to be considered" in deciding the "ultimate question" of "whether either or both of the parties perceived the rift in their relationship as final" (*Hardin, supra,* 38 Cal.App.4th at pp. 452, 453, italics omitted) — must be understood in the context of their facts, which reflect that in each case the parties had moved into separate places of residence. These cases do not address, and therefore are not authority for a conclusion that "living separate and apart" was intended by the Legislature, originally or subsequently, to require, as wife argues, *only* demonstrated conduct reflecting a subjective intent to part ways with no plan of resuming the marital relationship, which might, but need not necessarily, include physical separation. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [" 'It is axiomatic that cases are not authority for propositions not considered.' "].) They are consistent with a view that both separate residences and demonstrated intent are necessary.

Moreover, as far as can be determined from the decisions, none of the cases that have construed section 771(a) and its predecessors have traced the statutory language back to the original, uncodified, 1870 Act. In our view, consideration of the 1870 Act and its historical background helps to determine the Legislature's intent in using the phrase "living separate and apart." It provides support for a common meaning interpretation of the language, as well as context for what

20

followed.  It is true that a number of cases have noted the lack of a specific statutory definition and have expressed a view that there is a similar lack of legislative history regarding how to determine the date of separation, i.e., the date on which the parties began living separate and apart.  (*Manfer, supra,* 144 Cal.App.4th at p. 929 [observing that "the statute does not define 'date of separation' or specify a rule for determining it"]; *Norviel, supra,* 102 Cal.App.4th at p. 1158 [same]; *Hardin*, *supra*, 38 Cal.App.4th at pp. 450-451 [same]; *Baragry*, *supra*, 73 Cal.App.3d at p. 448 [referring to "what little law defines separation"].)  But to the extent these comments suggest that there is a lack of discernable legislative intent with respect to the underlying requirement of separate residences, we disagree.  When the 1870 Act is viewed as part of section 771(a)'s statutory history and in context, there emerges an apparent legislative intent and purpose substantiating the ordinary linguistic understanding of the phrase "living separate and apart."

The issue of whether spouses must be residing in separate places in order to support a finding that they are "living separate and apart" under the statute was finally expressly considered in *Norviel, supra,* 102 Cal.App.4th 1152.  Citing many of the cases that we have reviewed, the majority in *Norviel* recognized that "[d]ecisional law . . . clearly establishes that parties may live apart and yet not be separated."  (*Id.*, at p. 1162.)  It concluded, however, that the reverse is not also true.  The *Norviel* majority held that "living apart physically is an indispensable threshold requirement to separation, whether or not it is sufficient, by itself, to establish separation."  (*Ibid.*)  The court found support for that conclusion in the statutory language, in the early decisions of this state, and in decisions from

21

several other jurisdictions. (*Id.*, at pp. 1162-1163.)[5] The *Norviel* majority acknowledged that its "conclusion [did] not necessarily rule out the possibility of some spouses living apart physically while still occupying the same dwelling[,]" but found that "this [was] not such a case." (*Id.*, at p. 1164.)

The dissent in *Norviel* found that substantial evidence supported the trial court's finding of a date of separation that was prior to husband moving out of the marital home because husband had clearly communicated his intent to end the marriage and the parties' conduct thereafter was consistent with that intent. (*Norviel, supra,* 102 Cal.App.4th at pp. 1165-1167 (dis. opn. of Bamattre-Manoukian, J.).) According to the dissent, the majority's rule was unworkable, largely because it did not allow a couple who has reached the decision to end their marriage "a transition period to take the necessary steps to untangle the financial, legal and social ties incident to their decision." (*Id.*, at p. 1166.) Without recognizing that the facts in *Hardin*, *supra*, 38 Cal.App.4th 448, reflected a separation of residences, the dissent stated that it would apply the test articulated by the *Hardin* court, which required consideration and evaluation of all of the

---

**5**      The *Norviel* majority noted *In re Marriage of Johnson* (1982) 134 Cal.App.3d 148, was the only case husband proffered as authority for his position that parties may live together and still be considered separated. (*Norviel, supra,* 102 Cal.App.4th at p. 1162.) In *Johnson*, *supra*, at page 155, husband contested the trial court's finding of the date of separation, but the reviewing court concluded, in a single paragraph with little discussion, that the trial court's determination was based upon substantial evidence. The *Norviel* majority was not convinced that *Johnson* was contrary to the conclusion that it reached, given *Johnson*'s sparse recitation of the relevant facts. (*Norviel, supra*, at p. 1162.) We agree. But to the extent that it can be argued that the *Johnson* court determined that living separate lives was sufficient for purposes of former section 5118 (*Johnson, supra*, at p. 155), it is contrary to the evidence of legislative intent that we have discussed.

22

evidence regarding " 'the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final.' " (*Norviel*, *supra*, 102 Cal.App.4th at p. 1168.)[6]

There appears to have been no reaction from the bench or bar subsequent to the *Norviel* decision contending that the *Norviel* majority had introduced a sudden new rule that was legislatively unintended and unworkable. No movement to promote the position of the *Norviel* dissent seems to have materialized. And, although we recognize that legislative inaction after a judicial decision does not necessarily imply legislative approval (*County of Los Angeles v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 404), it is also interesting to observe that the Legislature has had more than a decade to amend section 771(a) in response to the *Norviel* majority's recognition of a threshold requirement of physically separate places of residence and has failed to do so.

From this survey of the history of section 771(a) and its predecessor statutes, as judicially construed, we are convinced that the Legislature intended the statutory phrase "living separate and apart" to require both separate residences and accompanying demonstrated intent to end the marital relationship. Consistent with the statute's history and the developed standard articulated by the case law, we hold that "living separate and apart" refers to a situation in which spouses are living in separate residences and at least one of them has the subjective intent to end the marital relationship, which intent is objectively evidenced by words or

---

[6] The Court of Appeal in the present case found the dissenting opinion in *Norviel* to be compelling and wife reiterates the position here.

23

conduct reflecting that there is a complete and final break in the marriage relationship.[7]

### 3. Public Policy Considerations

Wife contends that a bright-line rule, such as we articulate, will be overly simplistic, will lead to unjust, harsh results, and is, essentially, against current public policy considerations. She suggests that "[a] typical spouse in California, for example, may face further financial difficulties simply by being required to move out of the marital residence as a prerequisite to establishing the date of separation rather than intentionally and meaningfully living as roommates at the same residence, while taking the necessary steps to untangle any outstanding financial, legal and social ties incident to that spouse's decision to terminate the marriage." She points out that there may be spouses who need to reside in the same residence as "roommates" because of foreclosure, job loss, or other economic factors. She suggests that others may wish to share the same residence in order to coparent their children. Finally, she speculates concerning the difficulty a spouse may encounter in obtaining a move-away order.

Wife's arguments are not without weight. However, it bears repeating that the issue before us is a question of interpretation of a community property statute. Our goal in construing statutory language is to give effect to the Legislature's intent and purpose. (*Ceja v. Rudolph & Sletten, Inc.*, *supra*, 56 Cal.4th at p. 1119.) Here we find original legislative intent to use the language in its common and

---

[7] Under the facts presented by this case, we have no occasion to consider, and expressly reserve the question, whether there could be circumstances that would support a finding that the spouses were "living separate and apart," i.e., that they had established separate residences with the requisite objectively evidenced intent, even though they continued to literally share one roof.

ordinary sense as requiring separate places of residence before the earnings and accumulations of a wife during marriage could be characterized as the wife's separate property. We understand the original legislative purpose of the statute to be the protection of and provision for a wife who was estranged and living physically separate from her husband. Thus, the statutory phrase "living separate and apart" required that the spouses be living in separate residences. We find no evidence of any subsequent change in the legislative intent to apply the commonly understood meaning of that language or change of legislative purpose in protecting a vulnerable spouse, which alter the meaning of this statutory phrase. Admittedly, the statute, as so construed, may work hardship in some specific situations, but we cannot say it is absurd. (*People v. Leiva* (2013) 56 Cal.4th 498, 506 [a literal construction may be rejected where it would result in absurd consequences the Legislature could not have intended].) Very much to the contrary; a bright-line rule, as husband points out, promotes fairness by providing a measure of predictability to the parties and their attorneys, as well as clear guidance to judges. It reduces the potential for manipulation of a more elastic standard by the higher earner in situations of significant disparity of spousal income. It provides separate property classification of earnings and accumulations where the need is greatest because each spouse is maintaining his or her own separate place of residence. It retains the presumption of community property for earnings and accumulations acquired during marriage during a period of time likely to be prior to the institution of court proceedings and any court order of support, thereby protecting the lower earning spouse.

The requirement of separate residences for purposes of section 771(a) promotes reasonable public policy interests, but if there are other policy concerns that now advise the adoption of a different rule, it is up to the Legislature to craft

25

one.  (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1015; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 174.)

### *C.  Conclusion*

We conclude that living in separate residences "is an indispensable threshold requirement" (*Norviel, supra*, 102 Cal.App.4th at p. 1162) for a finding that spouses are "living separate and apart" for purposes of section 771(a).  This interpretation of the statutory language aligns with the common understanding of the words, the statutory history of the provision, and legitimate public policy concerns.  Because the Court of Appeal rejected such a requirement as a matter of statutory construction, it erred as a matter of law.

## III.  DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded for proceedings consistent with our opinion.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

26

**CONCURRING OPINION BY LIU, J.**

I agree with today's opinion that the phrase "living separate and apart" in Family Code section 771, subdivision (a) (hereafter section 771(a)) "refers to a situation in which spouses are living in separate residences and at least one of them has the subjective intent to end the marital relationship, which intent is objectively evidenced by words or conduct reflecting that there is a complete and final break in the marriage relationship." (Maj. opn., *ante*, at pp. 23–24.) I also agree that it remains open "whether there could be circumstances that would support a finding that the spouses were 'living separate and apart,' i.e., that they had established separate residences with the requisite objectively evidenced intent, even though they continued to literally share one roof." (*Id.* at p. 24, fn. 7.) I write separately to note that in addressing that question, courts should understand the purpose of section 771(a) in light of relevant changes in historical context that have occurred since 1870 when the Legislature enacted the original version of the statute.

The phrase "living separate and apart" first appeared in an uncodified 1870 statute titled "An Act to protect the rights of married women in certain cases." (Stats. 1870, ch. 161, p. 226 (hereafter the 1870 Act).) This statute provided that "[t]he earnings and accumulations of the wife . . . , while the wife is living separate and apart from her husband, shall be the separate property of the wife." (*Id.*, § 2, p. 226.) The 1870 Act further provided that a wife "living separate and

1

apart from her husband" had "sole and exclusive control [over] her separate property," could "sue and be sued" without joinder of her husband, and could "avail herself of and be subject to all legal process in all actions, including actions concerning her real estate." (*Id.*, § 3, p. 226.)

Although the 1870 Act included no definition of "living separate and apart," the Legislature clearly contemplated *separate addresses* for the husband and wife. As the court explains, "[s]ection 4 of the 1870 Act provided a procedure for a wife who was 'living separate and apart' from her husband to sell her real property without joining with her husband. To do so, the wife was required to record a verified and acknowledged declaration 'containing a description of such real estate, the name of her husband, *her own place of residence*, and [stating] that she is a married woman, *living separate and apart from her husband.*' (1870 Act, Stats. 1870, ch. 161, § 4, p. 226, italics added.) The statutory requirement that the wife state in a declaration 'her own' place of residence that is 'separate and apart from her husband' strongly suggests that the 1870 Act was directed at a situation where the spouses had physically separated and the wife in fact *had* 'her own' residence." (Maj. opn., *ante*, at pp. 8–9.)

Today's opinion accurately describes the context and purpose of the 1870 Act. At the time, "married women had very limited power over their property. In the absence of a binding premarital agreement, the husband had the absolute right of 'management and control' of the community property of the marriage, including the power of sale of assets," as well as considerable power over the wife's separate property. (Maj. opn., *ante*, at pp. 9–10.) "Under the statutory scheme in effect in 1870, until entry of a decree of dissolution of the marriage . . . , it appears that a woman who was either involved in divorce proceedings or whose husband had deserted or otherwise left her, and who did not have separate property coming within one of the statutory provisions giving her control over it, would

2

have no right of access to the financial sustenance needed to meet the expenses of daily life on her own." (*Id.* at p. 10.)

"When read as a whole and in this context, it seems evident that the 1870 Act was intended to afford married women some additional protection from the rigors of the law generally denying them control over their earnings and separate property. Under the authority of the 1870 Act, a wife whose husband was not physically living with her could undertake to support herself in her 'own' residence. Unlike other married women, she could retain her earnings and accumulations as her separate property to maintain her separate residence. She was given the right to control and dispose of her separate property. . . . [T]he 1870 Act should be understood as a limited exception to the general rule of that time that the husband had full management and control over the marital and separate assets for the duration of the marriage. It appears the Legislature was concerned only with the special and limited circumstance of a wife who was living physically separate from her husband. Such a wife was likely to be incurring separate expenses associated with her separate residence and could be anticipated to need the authority to separately maintain, control and manage such property. In such a situation, the 1870 Legislature determined an exception to the normal community property characterization of earnings and accumulations acquired during marriage and husband's control was appropriate." (Maj. opn., *ante*, at p. 11.)

The 1870 Act may be understood as a legislative response to cases like *Lawrence v. Spear* (1861) 17 Cal. 421. There a wife deserted by her husband engaged in a furniture business and sold furniture to the defendant. The husband sued the defendant to void the sale on the ground that he never consented to it. The court upheld the sale based on the legal fiction that the husband, having abandoned the wife, impliedly consented to her disposition of property for her own support. (*Id.* at pp. 423–424.) This fiction was necessary because the wife

3

had no control over community property and no way to accumulate or control her own separate property, even though she was living separate and apart from her husband. Moreover, divorce did not appear to be a widely accessible option. (See Stevenson & Wolfers, Marriage and Divorce: Changes and their Driving Forces (Spring 2007) 21 J. Econ. Persp. 27, 29, fig. 1 (Stevenson & Wolfers) [showing very low rate of divorce in the United States between 1860 and 1900].) The 1870 Act provided a narrow exception to the male-dominated property regime in order to protect a wife in such circumstances.

In 1971, the Legislature amended former Civil Code section 5118, the immediate predecessor to section 771(a), to make the statute gender-neutral. The amended statute said: "The earnings and accumulations of a spouse . . . , while living separate and apart from the other spouse, are the separate property of the spouse." (Stats. 1971, ch. 1700, pp. 3639–3640.) As the court notes, this amendment remedied "an inequity that had developed in the treatment of husbands and wives," whereby a wife living separate and apart from her husband could accumulate separate property before formal dissolution of the marriage, yet the husband could only accumulate separate property after obtaining an interlocutory judgment of dissolution. (Maj. opn., *ante*, at p. 15.)

Beyond addressing this specific concern, however, it is evident from context that the amended statute served a different purpose than the original 1870 Act. By 1971, the Legislature had long enacted reforms that gave married women control of their own earnings even though such earnings remained community property (Stats. 1951, ch. 1102, pp. 2860–2861), and by 1975, the Legislature had abandoned the male-controlled community property regime in favor of giving both spouses equal control (Stats. 1973, ch. 987, pp. 1897–1905; Stats. 1974, ch. 11, pp. 3590–3591). (See Prager, The Persistence of Separate Property Concepts in California's Community Property System, 1849–1975 (1976) 24 UCLA L.Rev. 1,

4

65–67, 73–74 & fn. 350.) Moreover, divorce had become more common by 1971 (Stevenson & Wolfers, *supra*, 21 J. Econ. Persp. at p. 29, fig. 1), and two years earlier, California had become the first state in the nation to adopt a no-fault divorce law (Family Law Act, 1969 Stat., ch. 1608, § 8). These reforms occurred in the context of other legal developments promoting gender equality. (See *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1; *Reed v. Reed* (1971) 404 U.S. 71.)

Thus, by 1971, an estranged wife living separate and apart from her husband had no need for a special statutory dispensation to earn and control separate property in order to provide for her own sustenance. She already controlled the portion of the community comprised of her own earnings, and she was soon to have equal control of all community property. Thus, the gender-neutral version of the statute enacted in 1971 no longer served the same protective purpose of the gender-specific 1870 Act. The modern statute is best understood to have a different purpose: Instead of addressing a nonexistent need to free one spouse from the other's exclusive control of community property, the statute — consistent with contemporary norms of gender equality — evenhandedly recognizes the separateness of each spouse's earnings and accumulations in situations where the spouses have effectively though not formally ended their marriage. In short, the statute recognizes a separation before divorce that effectively ends the community.

Today's opinion ascribes to the Legislature a continuing purpose of "protecting a vulnerable spouse" in construing the phrase "living separate and apart" to have the same meaning today as it did in 1870. (Maj. opn., *ante*, at p. 25.) But whereas a narrow construction of the phrase now "protect[s] the lower earning spouse" by "reduc[ing] the potential for manipulation of a more elastic standard by the higher earner" (*ibid.*), a narrow construction served no similar protective purpose in 1870. To the contrary, the Legislature in 1870 understood

5

"living separate and apart" narrowly to mean separate addresses because it sought to create "a *limited* exception to the general rule of that time that the husband had full management and control over the marital and separate assets for the duration of the marriage." (*Id.* at p. 11, italics added.) A *broader* understanding of "living separate and apart" — one that enabled an estranged wife to earn and control separate property without living at a separate address from her husband — would have been *more* protective of the vulnerable spouse in 1870. Yet it also would have meant greater property rights for married women at the expense of the male-controlled property regime, and there is no indication that the Legislature in 1870 had any interest in fundamentally changing that regime. The 1870 statute was protective because it created an exception to the male-dominated property regime, not because the exception it created was a narrow one.

By 1971, the Legislature had revised the archaic laws granting husbands exclusive control of marital assets, and the original motivation for construing "living separate and apart" narrowly had become obsolete. Now the gender-neutral statute, premised on the legal equality of husband and wife, simply recognizes the separateness of each spouse's earnings and accumulations at the point when the spouses have effectively but not formally ended the marriage, i.e., when the spouses are "living separate and apart." Construing this phrase as it appears in the modern statute, I agree that its most natural meaning (maj. opn., *ante*, at pp. 6–7) as well as practical considerations of clarity and administrability (*id.* at p. 25) suggest that whether spouses are "living separate and apart" turns not solely on the subjective intent of at least one spouse, but also on an objective manifestation of that intent by some form of physical separation. However, countervailing considerations of family economics and parenting (*id.* at p. 24) suggest that the physical separation need not assume the precise form that the Legislature in 1870 envisioned, namely, separate addresses.

6

In considering whether spouses living under the same roof are "living separate and apart" for purposes of section 771(a), we are not bound by the 1870 Legislature's narrow understanding of that term.  Rather, in light of the current purpose of section 771(a), the question is whether the spouses, in addition to their intent to separate, have demonstrated "unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof."  (*In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1164.)  In order to qualify as "living separate and apart," the spouses must have a living arrangement that clearly and objectively signals a complete and final termination of the marital relationship.  Neither the Legislature nor this court has foreclosed the possibility that such a living arrangement may occur within a single dwelling.

**LIU, J.**

**I CONCUR:**
**WERDEGAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Marriage of Davis

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 220 Cal.App.4th 1109
**Rehearing Granted**

_____

**Opinion No.** S215050
**Date Filed:** July 20, 2015

_____

**Court:** Superior
**County:** Alameda
**Judge:** Elizabeth Hendrickson, Commissioner

_____

**Counsel:**

Law Office of Stephanie J. Finelli and Stephanie J. Finelli for Appellant.

Ferguson Case Orr Paterson, Wendy C. Lascher; Ivie, McNeill & Wyatt and Lilia E. Duchrow for Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephanie J. Finelli
Law Office of Stephanie J. Finelli
3110 S Street
Sacramento, CA  95816
(916) 443-2144

Lilia E. Duchrow
Ivie, McNeill & Wyatt
444 South Flower Street, Suite 1800
Los Angeles, CA  90071
(213) 489-0028