Filed 1/7/16  O'Brien v. AMBS Diagnostics CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| TIMOTHY P. O'BRIEN et al., | B260301 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. GC048333) |
| v. | |
| AMBS DIAGNOSTICS, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. C. Edward Simpson, Judge.  Affirmed in part, reversed in part.

Robert D. Feighner; Pumilia Patel & Adamec, Paul Rosenberger, Jayesh Patel, for Plaintiffs and Appellants.

Miller, Monson, Peshel, Polacek & Hoshaw, Thomas M. Monson, Susan L. Horner; Butterfield Schechter; Marc S. Schechter, Paul D. Woodard, for Defendants and Respondents.

\* \* \* \* \* \*

Plaintiff, cross-complainant, and cross-defendant Timothy O'Brien (plaintiff) was a member of and served as the chief executive officer of defendant and cross-complainant AMBS Diagnostics, LLC (the LLC). Problems arose when he unilaterally gave himself a higher share of the LLC's profits, moved to dissolve the LLC, formed a competing business and made efforts to clandestinely divert the LLC's existing and potential clients to his new business. The LLC and another member sued plaintiff for breach of contract, breach of fiduciary duty, and negligent interference with a prospective economic advantage. Plaintiff then counter-sued against that and another member for breach of fiduciary duty. After a week-long bench trial, the trial court found for the LLC and its other members, denied plaintiff relief on his claim and dissolved the LLC. Plaintiff appeals all of these rulings. We conclude that the trial court's verdict for the LLC and its order of dissolution were properly decided, but reverse and remand its orders finding plaintiff liable for breach of contract and totally rejecting plaintiff's breach of fiduciary duty claim.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

#### A.    *Creation and early operation of the LLC*

In May 2010, cross-complainant and cross-defendant Eric Korsh (Korsh) and American Medical Billing Solutions, LLC (Billing Solutions) signed a one-page partnership agreement to form the LLC and to split its profits evenly. Billing Solutions had been formed a few months earlier by plaintiff, by cross-defendant Edward Panconi (Panconi), and by Arian Orr (Orr). Plaintiff, Panconi, Orr, and Korsh were named as the LLC's members; plaintiff, Panconi and Orr were designated as the LLC's managers; and plaintiff was appointed as its chief executive officer. Because Billing Solutions split its profits between plaintiff, Panconi and Orr in a ratio of approximately 45 / 45 / 10 percent, respectively, *the LLC's* profits were to be distributed as follows: Korsh, 50 percent; plaintiff and Panconi, 22.5 percent each; and Orr, 5 percent.

The LLC was in the business of facilitating the analysis of urine samples for physicians' patients and subsequently billing insurance companies for that service. The

LLC provided the doctors' offices with urine cups, lab forms, mailing envelopes and fax transmission sheets. The LLC then contracted with a third party testing lab to conduct the urinalysis and to provide the doctors with the completed lab work-ups; it also hired a third party data entry company to maintain a database containing the patient and insurance information faxed in by the doctors, which the LLC, through Billing Solutions, would use to bill the patients' insurance companies.

The LLC was profitable. In 2010 alone, the LLC earned a gross income of $489,000 and a net business income of $224,000.

### B.      *Plaintiff's unilateral modification of the LLC's profit sharing*

In January 2011, plaintiff unilaterally changed the distribution of the LLC's profits, increasing his and Panconi's shares from 22.5 percent to 33 percent and reducing Korsh's from 50 percent to 33 percent; Orr was to receive 10 percent of whatever plaintiff and Panconi received. Although plaintiff testified that he had Korsh's permission to make this change, the trial court found plaintiff not to be credible. Plaintiff, Panconi and Orr also authorized the LLC to pay them higher salaries, which further eroded Korsh's profit share. Korsh objected once plaintiff's acts came to light in August 2011.

### C.      *Plaintiff's actions after Korsh objected to new distribution of profits*

In October 2011, Plaintiff, Panconi, and Orr sued to dissolve the LLC.

In late December 2011, plaintiff set up a competing business, Liberty Diagnostics, LLC (Liberty), which—like the LLC—provided urinalysis processing and billing to physicians. About two weeks before forming Liberty, plaintiff made a presentation to a potential client for the LLC called Specialty Health. Four days after that presentation, plaintiff resigned as the LLC's chief executive officer, but he backdated his resignation letter by nearly a week. The same day he formed Liberty, plaintiff again spoke to Specialty Health, but did not clarify that he was no longer representing the LLC. Plaintiff told at least one Specialty Health physician that the LLC was dissolving but that all of its employees had migrated over to Liberty. In early 2012, plaintiff directed the third party data entry company used by the LLC to migrate the LLC's billing data and work product

3

to a separate account he had created for Liberty. Plaintiff also directed the third party testing lab to switch certain doctors from the LLC's account to Liberty's. When Panconi learned about plaintiff's directive to the data entry company, he countermanded that directive.

### D. Reconstitution of the LLC

After plaintiff resigned as the LLC's chief executive officer, Panconi and Orr also resigned as managers. At a spring 2012 meeting of the LLC, Panconi and Korsh voted themselves to be managers of the LLC, and voted to pay Korsh, Panconi, and Orr salaries. Neither plaintiff nor Orr attended that meeting, and they did not otherwise approve these actions. The LLC's 2012 tax returns reflected that the LLC paid $125,750 in guaranteed payments and $75,350 in legal and other professional fees.

## II. Procedural History

### A. Lawsuits

#### 1. The action to dissolve the LLC

As noted above, plaintiff, Panconi and Orr moved to dissolve the LLC in October 2011, although both Panconi and Orr subsequently withdrew as plaintiffs from that action.

#### 2. Korsh's cross-action against plaintiff

Korsh filed a cross-claim to the dissolution action, suing plaintiff, Billing Solutions and Liberty, alleging that plaintiff and Billing Solutions breached the one-page contract to split the LLC's profits evenly.[1]

#### 3. The LLC's cross-action against plaintiff and Liberty

On the LLC's behalf, Korsh also sued plaintiff, Billing Solutions, and Liberty, alleging (1) breach of fiduciary duty (against O'Brien), and (2) negligent interference

---

[1] Korsh's initial complaint also named Panconi and Orr as cross-defendants. However, Korsh later dismissed them as cross-defendants. Korsh also alleged breach of fiduciary duty, fraud, breach of breach of the implied covenant of good faith and fair dealing, conversion, malpractice, unjust enrichment, and unfair competition—which were either dismissed by himself or the trial court.

4

with a prospective economic advantage (against O'Brien, Billing Solutions and Liberty). These claims were based on plaintiff's conduct vis-à-vis Specialty Health and the third party testing lab and data entry companies. The operative cross-complaint sought punitive damages.

### 4. Plaintiff's cross-claim against Korsh and Panconi

Plaintiff filed a further cross-claim to Korsh's action, alleging that Korsh and Panconi breached their fiduciary duties as managers of the LLC by obtaining guaranteed salaries without the approval of *all* of the LLC's members.

### B. *Rulings*

Soon before trial was to begin, Korsh and Panconi invoked their statutory right to buy out plaintiff's interest in the LLC in lieu of dissolving the LLC. (Corp. Code, § 17351, subd. (c)[2].) The trial court appointed appraisers, who fixed the LLC's value at $503,000. However, the court did not set a date by which Korsh and Panconi were required to pay plaintiff his share of that value; instead, the court opted to try the pending cross-actions in the event they affected the LLC's value.

The three cross-actions proceeded to a week-long bench trial. The trial court issued a written statement of decision. First, the court dissolved the LLC after Korsh and Panconi withdrew their request for a buyout. Second, the court found that plaintiff had breached the one-page contract with Korsh, and awarded Korsh $86,943.48 in damages and costs. Third, the court found "overwhelming" evidence that plaintiff had breached his fiduciary duties to the LLC and interfered with its relationships with its current and potential customer base. The court further concluded that both plaintiff and Liberty "engaged in oppression, fraud and malice" by discussing how to cut Korsh out of the

---

[2] The provisions of the Corporations Code governing limited liability companies were amended in 2013. Because the Legislature specifically declined to make these amendments retroactive to conduct occurring before January 1, 2014 (Corp. Code, § 17713.04, subd. (b)), this opinion deals with the pre-2014 statutes in effect at the time of the conduct at issue. (Accord, *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1480, fn. 18.) Unless otherwise indicated, all further statutory references are to the Corporations Code.

LLC's profits in 2011 and by "divert[ing]" the LLC's business to Liberty by misleading the third party vendors. The court awarded the LLC $487,977 in compensatory damages and, after evaluating evidence of plaintiff's and Liberty's financial conditions, an additional $125,000 in punitive damages. Lastly, the court concluded that plaintiff had not proven his claim for breach of fiduciary duty against Korsh or Panconi.

The court denied plaintiff's and Liberty's motion for new trial, and entered four separate judgments.

Plaintiff and Liberty timely appeal.

## DISCUSSION

### I. Dissolution Action

Plaintiff argues that (1) the trial court erred in not entering an alternate decree dissolving the LLC in the event that Korsh and Panconi did not pay him his share of the LLC's appraised value by a specific date, and (2) this error precluded the court from dissolving the LLC and instead required the court to order Korsh and Panconi to buy out his share. We apply de novo review to each contention. (See *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 [application of law to undisputed facts reviewed de novo]; *Estate of Kraus* (2010) 184 Cal.App.4th 103, 112-113 [availability of remedies for statutory violations reviewed de novo].) We conclude that plaintiff's first argument is well taken, but his second is not.

Any member of an LLC may file an action to dissolve that LLC when, among other reasons, the LLC's "management . . . is deadlocked or subject to internal dissention." (Former § 17351, subd. (a)(4).) However, the remaining members of the LLC have a statutory right to "avoid the dissolution . . . by purchasing for cash the membership interests owned by the members [suing for dissolution] at their fair market value." (*Id*., subd. (b)(1).) If the LLC members invoke this buyout provision, the court must fix the fair market value of the LLC and "enter a decree that alternatively directs the winding up and dissolution to proceed unless payment for the membership interests is tendered 'within the time specified by the decree.'" (*Dickson v. Rehmke* (2008) 164 Cal.App.4th 469, 474, quoting former § 17351, subd. (b)(3).) The court may not delay

entry of the alternate decree, even to allow valuation issues to be resolved in the pending dissolution action (see *Cotton v. Expo Power Systems, Inc.* (2009) 170 Cal.App.4th 1371, 1374, 1381-1382 (*Cotton*) [so noting, as to analogous provision for corporations]) or at the request of the members requesting the buyout (*Go v. Pacific Health Services, Inc.* (2009) 179 Cal.App.4th 522, 530-531 (*Go*) [so noting, as to analogous provision for corporations]). There is good reason for this: Postponing the buyout would effectively convert the mechanism that the Legislature created to summarily avoid a dissolution action into a right of the nonmoving LLC members to "wait and see" whether the posttrial resolution of claims between the LLC's members ends up being more favorable than the pretrial appraisal. (*Cotton*, at pp. 1381-1382.) Because the trial court in this case deferred entry of the alternate decree until the completion of trial, the court violated section 17351's mandate.

However, the remedy for this violation is dissolution of the LLC. Although the members who invoked the statutory buyout procedure "*elected* to do so" (*Go*, *supra*, 179 Cal.App.4th at p. 531), their election is not irrevocable. Nothing prevents an LLC member who petitions for a buyout from changing her mind on the day before the date fixed in a properly entered alternate decree. Why should the decision to seek a buyout become irrevocable once made—and consequently compel the voiding of subsequent dissolution order—just because the trial court failed to enter the alternate decree? Setting a deadline is designed to prevent game playing, and such game playing is effectively deterred by the rule forcing the members petitioning for buyout to accept dissolution at whatever value is fixed at trial. There is no reason to resort to plaintiff's suggested remedy of compelling a buyout given the illogical outcomes it compels. (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1237 [courts should not construe statutes in a manner that "'lead[s] to absurd results'"].) Because the trial court eventually decreed dissolution, there is no basis to disturb that order.

7

## II.    Korsh's Cross-Action

Plaintiff contends that the trial court erred in holding him individually liable for breach of contract because the one-page partnership agreement is between Korsh and *Billing Solutions*, not Korsh and *plaintiff*.  The one-page "Partnership Agreement" is between the "undersigned parties," and has two signature blocks—one for "Eric Korsh, M.D." and one for "Timothy P. O'Brien, Esq.[,] Chief Executive Officer[,] [Billing Solutions]."  The court concluded that plaintiff was a party to the contract because the agreement's signature block did "not reflect that [plaintiff] was acting on behalf of" Billing Solutions, thereby rendering the agreement ambiguous and obligating the court to construe the ambiguity against plaintiff as the agreement's drafter.  We review de novo whether a contract is ambiguous.  (*Christensen v. Smith* (2009) 171 Cal.App.4th 931, 937.)

"A contract is ambiguous when it contains language that is reasonably susceptible to more than one meaning."  (*Dameron Hospital Assn. v. AAA Northern California, Nevada and Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 568.)  Because "Chief Executive Officer, [Billing Solutions]" appears immediately beneath plaintiff's name and because the Agreement purports to divide the still-to-be-formed LLC's earnings between Korsh and Billing Solutions, we disagree with the trial court that the absence of the words "on behalf of" in the signature block renders the contract susceptible to the reading that plaintiff is a party to the contract in his individual capacity.   Because an LLC's members are not otherwise subject to personal liability for an LLC's acts (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212), the court erred in holding plaintiff liable for Billing Solutions' contractual debt.

We accordingly reverse the judgment against plaintiff on this count.  However, the trial court never addressed Korsh's claim against Billing Solutions for breach of this agreement.  We remand to the trial court to consider this claim in the first instance.

8

**III.   The LLC's Cross-Action**

   **A.   *Findings regarding liability***

   **1.   Implied preemption by the Uniform Trade Secrets Act**

Plaintiff argues that the LLC may not recover on any of its common-law tort claims because those claims are preempted by Uniform Trade Secrets Act (Act), Civil Code section 3426 et seq.  We review claims of statutory preemption de novo (see *Bridges v. City of Wildomar* (2015) 238 Cal.App.4th 859, 865), and conclude the Act's preemptive effect does not reach the LLC's tort claims.

The Act generally prohibits the misappropriation of trade secrets, but specifically preserves (1) "contractual remedies, whether or not based upon misappropriation of a trade secret," (2) "other civil remedies *that are not based upon misappropriation of a trade secret*," and (3) "criminal remedies, whether or not based upon misappropriation of a trade secret." (Civ. Code, § 3426.7, italics added.)  By negative implication, the italicized language has been read to "'implicitly preempt[] alternative civil remedies based on trade secret misappropriation.'" (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 954 (*K.C. Multimedia*).)  As to these alternative civil remedies, the Act "occupies the field" and "supersede[s] other causes of action even though [the Act] does not itself provide relief on a particular set of facts." (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 234, 237 (*Silvaco*), overruled on other grounds in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310.)  Consistent with this mandate, the Act preempts another civil remedy only if that remedy "hinges upon," is "predicated upon," "rests squarely on," or is "based entirely on" allegations that a trade secret was misappropriated. (*K.C. Multimedia*, at pp. 955, 959, 962; *Silvaco*, at p. 234.)  The Act "does not displace noncontract claims that, although related to a trade secret misappropriation, are independent and based on facts distinct from the facts that support the misappropriation claim." (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 506; cf. *K.C. Multimedia*, at p. 955 [preemption reaches only claims "'based on the same nucleus of facts as the misappropriation of trade secrets claim . . .'"].)

9

Plaintiff's argument is without merit. As alleged and proven at trial, the LLC's breach of fiduciary duty and intentional interference with a prospective economic advantage claims turned on plaintiff's acts in furtively transferring the LLC's accounts with the third party vendors to Liberty and in co-opting Specialty Health as a client; those claims, while undoubtedly "related" to trade secret misappropriation, do not "hinge upon" a theft of trade secrets. Thus, it is of no moment that the LLC's briefs on appeal refer to plaintiff's migration of the LLC's customer base or use of the LLC's business model. Plaintiff also points to the fact that the LLC, in pleading these two causes of action, incorporated by reference all of the earlier allegations in the complaint, but this common pleading practice does not somehow alter the factual basis for the LLC's claims. At bottom, plaintiff's objection rests on the notion that the LLC's claims are preempted because they involve its customers and because customer lists are sometimes trade secrets (e.g., *Wanke, Industrial, Commercial, Residential, Inc. v. Keck* (2012) 209 Cal.App.4th 1151, 1174-1175). This suggestion is at odds with the precedent noted above, and would effectively nullify any common law cause of action involving a past, present, or future customer of a plaintiff. Such an outcome is inconsistent with the Act's language and purpose, and we reject it.

### 2. Breach of fiduciary duty claim

Plaintiff contends that the trial court erred in finding him liable for breach of fiduciary duty because (1) he owed the LLC no fiduciary duty once he resigned as its manager, and (2) even if he owed a fiduciary duty, he did not breach that duty. "'Whether a fiduciary duty exists is generally a question of law,'" while "'whether [a person] breached that duty . . . is a question of fact.'" (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 441.) We review the former de novo, and the latter for substantial evidence. (E.g., *In re Marriage of Davis* (2015) 61 Cal.4th 846, 851.)

Where, as here, an LLC is managed by designated managers rather than by all of its members (former §§ 17001, subd. (w), 17150, 17151, subd. (a)), "[t]he fiduciary duties a manager owes to the [LLC] and its members are those of a partner to a

10

partnership and to the partners of the partnership" (former § 17153). "Partners are trustees for each other," and are "bound to act in the highest good faith to [their] copartner[s]." (*Page v. Page* (1961) 55 Cal.2d 192, 197 (*Page*); *Agam v. Gavra* (2015) 236 Cal.App.4th 91, 112-113 ["""Partnership is a fiduciary relationship . . ."""].) A partner consequently owes a fiduciary "duty of loyalty to the partnership and the other partners" that obligates him, among other things, to (1) "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity" (§ 16404, subd. (b)(1)), and (2) "refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership" (§ 16404, subd. (b)(3)). Although a partner does not violate these duties "merely because [his] conduct furthers [his] own interest" (§ 16404, subd. (e)), it is well settled that "[a] partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his copartner for his share of the prospective business opportunity." (*Page*, at p. 197; *Rosenfeld v. Cohen* (1983) 146 Cal.App.3d 200, 213, overruled on other grounds in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 [noting breach of duty due to "partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his copartners"]; *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1551 (*Crouse*) ["ex-partner" may not "attempt[] to divert partnership opportunities for his personal benefit to the detriment of his former partners"]; *Prince v. Harting* (1960) 177 Cal.App.2d 720, 727-728 [partner may not set up "dummy middleman" in transactions involving partnership].)

In this case, the LLC presented evidence that plaintiff tried to divert the LLC's existing customer base to Liberty by directing the third party testing lab and third party data entry companies to transfer the LLC's customers to Liberty, and continued pursuing Specialty Health as a prospective client while purporting to still represent the LLC and later indicating that the LLC and Liberty were one and the same. This conduct falls

11

squarely within the prohibition against "divert[ing] partnership opportunities" for personal benefit. (*Crouse*, *supra*, 67 Cal.App.4th at p. 1551.)

Plaintiff seemingly raises two objections to this reasoning. First, he argues that he owed the LLC no fiduciary duties once he resigned as its manager. To be sure, a partner's duty not to compete with the partnership ends when he "disassociat[es]" from the partnership. (§ 16603, subd. (2).) However, his duty not to "appropriat[e] . . . partnership opportunities" continues "with regard to matters arising and events occurring before the partner's disassociation." (*Id.*, subd. (3).) In this case, the customers plaintiff sought to have the third party vendors transfer to Liberty were already clients of the LLC and plaintiff began to court Specialty Health as a client of the LLC before he resigned. (Accord, *Leff v. Gunter* (1983) 33 Cal.3d 508, 515 ["'"(a former partner) cannot make any profit to himself from a secret transaction *initiated* while [he is a] trustee . . ., no matter when it springs into actual operation."' (Citation.)]") Thus, his conduct falls within the scope of his fiduciary duty. Second, plaintiff appears to contend that the trial court erred in citing a partner's duty to act "consistently with the obligation of good faith and fair dealing" (§ 16404, subd. (d)) because the LLC did not rest its fiduciary duty claim on this specific obligation. We need not decide the propriety of the trial court's reliance on this basis because its finding that plaintiff breached his duty of loyalty is sufficient to support its verdict. (Accord, *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 ["'we review the ruling, not the court's reasoning . . .'"].)

### 3.    Interference with prospective economic advantage claim

Plaintiff asserts that the trial court did not have the legal or factual basis to find either him or Liberty liable for intentional interference with a prospective economic advantage. The court purported to rule on a claim of *intentional* interference, even though the operative cross-complaint alleged *negligent* interference.[3] This mistake in labeling the claim is of no consequence because, as discussed below, the court's ruling— and plaintiff's challenges to that ruling—turn on elements common to both types of

---

[3]    An earlier cross-complaint on behalf of the LLC had alleged *intentional* interference.

12

interference. To the extent plaintiff's challenges raise legal questions, we review them de novo; to the extent his challenges raise factual questions, we review them for substantial evidence. (*In re Marriage of Davis*, *supra*, 61 Cal.4th at p. 851.)

To prevail on a claim for intentional or negligent interference with a prospective economic advantage, the LLC has to prove (1) it had an "economic relationship" with a third party "with the probability of future economic benefit" to itself, (2) plaintiff knew of that relationship, (3) plaintiff "intentional[ly]" or negligently interfered with that relationship with the "design[] to disrupt the relationship" and in a manner that was "independent[ly]" "wrongful," (4) the relationship was actually disrupted, and (5) plaintiff's wrongful act proximately caused economic harm. (*Edwards v. Arthur Anderson LLP* (2008) 44 Cal.4th 937, 944 (*Edwards*) [intentional]; *National Medical Transport Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 439, fn. 20 [negligent].) "'[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'" (*Edwards*, at p. 944, quoting *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153-1159.)

Plaintiff levels four challenges to the trial court's ruling on this claim. First, he argues that the LLC did not prove that it had an "economic relationship" with any of the physicians whose orders were diverted to Liberty because each request for a urinalysis was a separate "at will" contract that carried no expectation of future orders. However, our Supreme Court many decades ago held that "interference with an at-will contract is actionable interference . . . ." (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1127.)

Second, plaintiff asserts that the LLC did not prove that he engaged in any "independently wrongful act" because his conduct was protected by the "privilege of competition." To be sure, "the privilege of free competition" protects a person's right to "'enter into competition with his former employer'" (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1518), and includes the right to announce his change of employment (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1156) and the right to prepare to compete

13

before resigning from his current employer (*Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 346).  (See also *Katz v. Kapper* (1935) 7 Cal.App.2d 1, 6 [actions one competitor takes to drive another out of business within privilege of competition].)  But "the privilege of free competition" only encompasses competition through "fair and reasonable means." (*Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153.)  That is precisely why the tort of interference with a prospective economic advantage requires a showing that the alleged interference be "independently wrongful." (*Ibid.*; *Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 ["The general wrong inherent in this tort is the unlawful interference with a business opportunity through methods which are not within the privilege of fair competition"].)  A breach of fiduciary duty constitutes "independently wrongful" conduct for purposes of this tort. (E.g., *Gemini Aluminum Corp. v. Cal. Custom Shapes* (2002) 95 Cal.App.4th 1249, 1258; *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1243.)  In light of our affirmance of the trial court's breach of fiduciary duty finding, we necessarily find that plaintiff's conduct was independently wrongful and thus outside the privilege of competition.

Third, plaintiff contends that the LLC did not prove that he or Liberty actually disrupted the LLC's relationships with the existing physicians or otherwise caused the LLC any damage.  In particular, he disputes the LLC's expert's opinion that the LLC suffered disruption and resulting damage.  The expert examined the third party vendors' databases as of May 31, 2012, and classified the data he found into five categories: (1) order forms naming only the LLC; (2) order forms naming both the LLC and Liberty; (3) order forms naming only Liberty; (4) amounts billed to Liberty on clients that historically belonged to the LLC, but where there no order forms pending; and (5) amounts reflecting orders faxed to, but not yet billed by, the LLC.  Because these five categories together captured all of the clients who had or might have been migrated from the LLC to Liberty, the expert opined that the total amount of orders from all five

14

categories corresponded to the disruption and damages caused by plaintiff and Liberty's acts in manipulating the third party vendors.

Plaintiff argues that the trial court erred in relying on this testimony. To begin, plaintiff posits that the court did not admit the order forms and fax cover sheets for their truth. Thus, he argues, the expert's opinion relying on them is invalid. However, "[e]xpert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type reasonably relied upon by experts in the particular field in forming their opinions." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618; Evid. Code, § 801, subd. (b); cf. *People v. McWhorter* (2009) 47 Cal.4th 318, 362 [expert may not rely on unreliable hearsay].) Plaintiff provides no reason to question the accuracy of the third party vendor records, which appear to meet most of the requirements of "business records" under the Evidence Code (see Evid. Code, § 1271); he also proffers no explanation as to why experts may not rely on such business records under similar circumstances.

Further, plaintiff challenges the expert's methodology. In plaintiff's view, the migration of physicians from the LLC to Liberty reflected in the order forms and fax cover sheets do not prove that any business was actually diverted; the expert, plaintiff asserts, simply assumed that physicians switching over to Liberty did so as a result of plaintiff's subterfuge rather than by choice. Because the expert did not ask the physicians about their change of company, plaintiff reasons that the expert's methodology is based upon an invalid assumption and should be rejected. We disagree. Trial courts may reject expert testimony if, among other things, it is "based on reasons unsupported by the material on which the expert relies, or . . . speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1504-1505.) Once this threshold is met, "substantive quarrel[s] . . . [over] valuation methodology goes to the weight, not the admissibility, of [the expert's] testimony." (*In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 699.) In this case, the expert's assumption that plaintiff was responsible for the migration of physicians from the LLC to Liberty was based upon plaintiff's conduct in misleading the third party billing company and the third party

15

testing lab into transferring the LLC's customer base to Liberty and in proclaiming that Liberty was effectively a new iteration of the LLC; given the evidence presented, this assumption was neither "unsupported" nor "speculative." Moreover, losses need only be fixed with "'reasonable certainty,'" and may be fixed "'with the aid of expert testimony.'" (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883-884.) Plaintiff's disagreement over the expert's conclusions in this case consequently goes to their weight, and thus does not prevent them from constituting substantial evidence.

Lastly, plaintiff complains that Korsh and Panconi also had businesses that directly competed with the LLC, and thus ostensibly committed a tort that gave them "unclean hands." Unclean hands is not an absolute bar to recovery, and instead turns on "'the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.'" (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 641, quoting *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060.) Plaintiff has forfeited this argument on appeal by not citing the pertinent case law or discussing how it applies. His claim also fails on the merits. Plaintiff has not adduced any evidence or otherwise explained how Korsh and Panconi breached any fiduciary duty to the LLC or otherwise interfered with its business or why *their* misconduct has any relationship to the LLC's recovery *against O'Brien*. (See *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1044 [declining to consider unclean hands defense lacking any direct connection to misconduct in operative complaint].)

### B. Damages claims

#### 1. Compensatory damages

Plaintiff contends that substantial evidence also does not support the trial court's compensatory damages award. In addition to rearguing the evidentiary and methodology defects he raises (and which we reject) with respect to the interference with prospective economic advantage claim, plaintiff raises two further arguments: (1) the expert erred in relying on the 69 percent collection rate from the appraisal report rather than the 23.2 percent collection rate that can be derived from a different summary chart of charges and receipts; and (2) the court erred in awarding damages for lost profits from the Specialty

16

Health opportunity based upon the profits Liberty earned from one of the doctors associated with Specialty Health because the expert did not opine on that topic.

Neither argument raises any cognizable error. The trial court's choice of one collection rate over another does not mean its decision is unsupported by substantive evidence. (See *People v. Hicks* (2014) 231 Cal.App.4th 275, 286 ["Conflicting evidence . . . does not cast doubt on the trial court's factual findings because we review factual findings for substantial evidence"].) What is more, Panconi provided the 69 percent collection rate to the appraisers who relied on it in their valuation of the LLC. Further, the court's decision to award damages from the loss of Specialty Health's business based on the profits Liberty earned from a Specialty Health physician is not unsupported, speculative or unreasonable; indeed, this decision relied upon the same methodology used by the LLC's expert in calculating damages due to the diversion of the LLC's business due to plaintiff's manipulation of the third-party vendors. We have concluded, above, that this methodology was sound when used by the expert; it is no less sound when used directly by the trial court.

### 2. Punitive damages

Plaintiff and Liberty proffer three reasons why the trial court's $125,000 punitive damages award should be vacated.

First, plaintiff and Liberty contend that they were denied due process because the trial court did not state its finding that plaintiff and Liberty had engaged in malicious behavior in its first tentative ruling after the trial. Where, as here, the facts are undisputed, we review this due process claim de novo. The imposition of punitive damages accords with due process as long as a prayer for punitive damages is pled (see *Behm v. Clear View Technologies* (2015) 241 Cal.App.4th 1, 9-11), and as long as the party assessed those damages "had every opportunity to present evidence, to argue the merits of its position, and to challenge [that] award in court" (see *Todd Shipyards Corp. v. Cunard Line* (9th Cir. 1991) 943 F.2d 1056, 1064). In this case, the LLC's operative pleading sought punitive damages, and plaintiff had every opportunity to present evidence on the question of malice during the trial. Additionally, after the court issued its

17

second posttrial tentative ruling finding malice, the court ordered discovery regarding plaintiff's and Liberty's financial conditions and convened a separate hearing on punitive damages; tellingly, plaintiff and Liberty do not contest that they were ever precluded from challenging the court's tentative finding of malice. In short, there was no denial of due process.

Second, plaintiff and Liberty assert that the trial court's finding of "malice" is not supported by the evidence. Punitive damages may be imposed "where it is proven by clear and convincing evidence that [a party] has been guilty of oppression, fraud, or malice . . . ." (Civ. Code, § 3294, subd. (a).) "Malice" means "conduct which is intended . . . to cause injury . . . or despicable conduct which is carried on . . .with a willful and conscious disregard of the rights or safety of others." (*Id.*, subd. (c)(1); *Lackner v. North* (2005) 135 Cal.App.4th 1188, 1210 [punitive damages warranted when wrongdoer "'""act(s) with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights"'"""].) The court found that plaintiff created Liberty; that he "diverted [the LLC's] business to [Liberty]" by "mislead[ing] the [third party testing lab] into believing that Liberty was merely a name change . . . and instruct[ing] that [the LLC's] accounts be transferred to Liberty" and by "maliciously instruct[ing] [the third party data entry service] to migrate [the LLC's] database to Liberty"; and that he "diverted to Liberty the business opportunities of [the LLC] with Specialty Health and justified that conduct with a back dated letter of resignation." "[T]his was all done," the court found, "with the malicious intent to cause loss and harm to" the LLC. The evidence outlined above constitutes substantial evidence supporting these findings. (Accord, *Sequoia Vacuum Systems v. Stransky* (1964) 229 Cal.App.2d 281, 283-284 [director and officer of corporation entered into competing business, used his position of trust and confidence to further his personal interests, and concealed his actions; punitive damages appropriate].)

Lastly, plaintiff and Liberty argue that the trial court's joint and several $125,000 punitive damages award was excessive. "The purpose [of punitive damages] is to deter, not to destroy." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 112.) As a result, punitive

18

damages are excessive if they "exceed the level necessary to properly punish and deter" by exceeding the party's "ability to pay" those damages. (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1308 (*Pfeifer*).)  Courts trying to ascertain a liable party's ability to pay must assess its financial condition, including its "actual wealth . . . at the time of trial" (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 194 (*Soto*)), which includes both its assets and liabilities as well as its income and expenses (*Pfeifer*, at p. 1308).  Our review for excessiveness is limited to determining whether the trier of fact abused its discretion in setting the amount. (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 78.)  There was no abuse here.

Plaintiff and Liberty argue that no punitive damages should have been awarded because they have a negative net worth.  Plaintiff comes to this arithmetic conclusion by treating net worth as the sole measure of financial condition and, in calculating net worth, by putting the $427,926 verdict in this case in the liability column.  Neither premise is correct.  Net worth is evaluated "at the time of trial" (*Soto*, *supra*, 239 Cal.App.4th at p. 194), and thus should not include judgments that follow trial.  More to the point, net worth is notoriously "susceptible to manipulation." (*Ibid.*; *Pfeifer*, *supra*, 220 Cal.App.4th at p. 1308.)  Indeed, in 2012, plaintiff listed his net worth as $952,000 in an application for a line of credit.  Further, plaintiff has a high earning capacity as an attorney and business advisor; in 2012 alone, he earned $180,000.  He and Liberty also have access to plaintiff's $100,000 personal line of credit, to Liberty's $68,313 line of credit, and to Liberty's 2014 potential account receivables balance of $335,709.  When plaintiff's and Liberty's ability to pay is evaluated in the light of this more fulsome explication of the evidence, the trial court did not abuse its discretion in concluding that a $125,000 punitive damages award was within plaintiff's and Liberty's ability to pay.

## IV.    Plaintiff's Cross-Action

Plaintiff finally argues that the trial court erred in denying him relief on his cross-claim alleging that Korsh and Panconi breached their fiduciary duty by (1) receiving "guaranteed payments" from the LLC without proper approval, (2) not giving plaintiff his share of the LLC's 2012 profits, (3) using the LLC's funds to fund this litigation, and

(4) convincing the court to issue a "wait-and-see" buyout order. We have already rejected plaintiff's last argument, and he did not raise the third argument below and may not do so for the first time on appeal. (E.g., *Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 882 [issues not presented to the trial court are deemed forfeited on appeal].) We review the first two arguments for substantial evidence; we reject the second, but conclude the first has merit.

Where, as here, an LLC's operating agreement does not authorize the LLC to pay its members for their work on behalf of the LLC, such payments are permitted only with the "agreement [of] all the [LLC's] members." (§ 17004, subd. (b).)[4] The evidence was undisputed that Korsh and Panconi voted to authorize the "guaranteed payments." However, the evidence was also undisputed that plaintiff and Orr did *not* vote to authorize those payments—either because they were not present at the meeting when the vote occurred or because they were present and voted "no." The trial court concluded that plaintiff failed to prove a lack of unanimous agreement. In light of the evidence we have summarized, the court's conclusion is not supported by substantial evidence. We accordingly reverse the court's ruling and remand so that the court may calculate the amount of those payments, which, once repaid to the LLC, should be distributed among the LLC's four members.

Plaintiff has not demonstrated error with respect to the LLC's 2012 profits. Plaintiff never asked the trial court to address this issue in its statement of decision, so we must "presume[] the trial court made all necessary findings supported by substantial evidence." (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970.) Here, the sole evidence plaintiff adduced on this issue was the LLC's 2012 tax return showing profit; what he did not prove is that he did not receive all the distribution owed to him. Absent that proof, we must presume the court found that he received the distribution to which he was entitled.

---

**4**     There is an additional exception for compensation related to winding up an LLC (§ 17004, subd. (b)), but the payments here all preceded the dissolution of the LLC.

## V. Judgment

The trial court entered four separate judgments, one for each action. Plaintiff argues that this was error because the cross-actions are all intertwined. The "one judgment rule" plaintiff relies upon precludes piecemeal appeals by requiring trial courts to enter a single judgment (as a predicate to a single appeal) when multiple, interrelated cross-actions are resolved. (See *Knodel v. Knodel* (1975) 14 Cal.3d 752, 760; *Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1594; *Lemaire v. All City Employees Assn.* (1973) 35 Cal.App.3d 106, 109 ["one judgment rule" applies where cross-actions are not "sufficiently independent"].) The rule is not squarely implicated here, where the court entered final judgments on all of the actions but chose to do so in separate documents.

However, the judgment does contain a clerical error: It says nothing about the disposition of the LLC's claim for negligent interference with a prospective economic advantage. Because the trial court clearly rejected that claim on the merits, we direct the court to amend the judgment on the LLC's cross-action to reflect the entry of judgment on the negligent interference with prospective economic advantage claim. (See *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 308 [appellate court has discretion to amend judgment to reflect trial court's intent].)

## DISPOSITION

We affirm the dissolution decree and judgment for the LLC on its cross-claims against plaintiff and Liberty. We reverse the judgment for Korsh on his cross-claim against plaintiff for breach of contract, and remand so that the trial court can determine whether Billing Solutions is liable. We also affirm in part and reverse in part the judgment for Korsh and Panconi on plaintiff's cross-claim for breach of fiduciary duty, and remand so that the court may calculate the amount of improperly authorized guaranteed payments, which, once repaid to the LLC, should be distributed among the LLC's four members. Each party to bear its own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
HOFFSTADT

We concur:

_____, Acting P.J.
ASHMANN-GERST

_____, J.
CHAVEZ

22