Filed 12/8/20  Marriage of Hibbert CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Marriage of SHARON and WINSTON HIBBERT. | B291518 <br><br> (Los Angeles County Super. Ct. No. LD073762) |
| WINSTON HIBBERT, <br><br>     Petitioner and Appellant, <br><br>      v. <br><br> SHARON WINSTON, <br><br>     Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shirley K. Watkins, Judge.  Affirmed as modified.

Charles O. Agege for Petitioner and Appellant.

No appearance for Respondent.

————————————

# INTRODUCTION

Winston Hibbert appeals from a family law judgment adjudicating the parties' date of separation, characterizing real property as Sharon Hibbert's separate property, and denying Winston's reimbursement claims. Winston contends that substantial evidence does not support the trial court's rulings and that the trial court abused its discretion in admitting certain evidence. We modify the judgment to correct two errors and affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Background*

Winston and Sharon were married on October 6, 1987.[1] They have two daughters, Princessa and Melissa, both adults. On April 27, 2016, Winston filed a petition for dissolution of marriage listing September 15, 2015 as the date of separation. Sharon contended the date of separation was December 17, 2006. Winston represented himself at the trial. Counsel represented Sharon. The trial occurred on May 23, 2017, August 15, 2017, December 26, 2017, and March 21, 2018.

Sharon worked for a trucking company driving a "big rig" truck all over the United States. She was gone from home for months at a time. Although Melissa and Sharon testified that Winston earned money from illegal drug sales, Winston testified that he worked as a handyman.

---

[1] To avoid confusion, we refer to the parties by their first names.

B.    *In Early 2007, Sharon and Melissa Move Across the Street*

Sharon, Winston, and Melissa resided in an apartment on Vanowen Street in Van Nuys.  Sharon testified that, on December 17, 2006, Winston hit her in the face during an argument, injuring her nose.  Sharon testified that there was blood "all over."  Melissa, who at the time was 11 years old, testified that she heard her parents argue, saw Winston "chase [Sharon] down the hallway," and observed Sharon with "blood all over her clothes and her face."  According to Sharon, because Winston pointed a gun at her, telling her that "if you call the police, you know, [he was] not going back to prison," Sharon was afraid to tell the police that she had an altercation with Winston.  Melissa went to the hospital with Sharon.  Winston did not deny that he struck Sharon.

According to Sharon, the domestic violence severed the marriage.  After the incident, she and Winston did not have sexual relations, use the same bathroom, or have a meal together.  Further, according to Sharon, after the incident, she and Winston did not celebrate Christmas together or go out as a couple.  In early January 2007, because of Sharon's intent to end the marriage, Melissa and Sharon vacated the apartment and moved across the street to a house on the property of Mary Behmer, a family friend.  According to Melissa, Behmer permitted her and Sharon to live rent-free in the back house on Behmer's property because Behmer was a family friend.  Behmer lived in the front house on the same property.

C.    *Winston Also Moves Across the Street*

Sharon testified that Winston did not move with her and Melissa to the back house on the Vanowen property.  However,

3

Winston did live on the Vanowen property. Melissa and Sharon testified that Winston "lived in the shed," a separate structure on the Vanowen property. Later in her testimony, when asked why Winston was living in the front house with Behmer, Sharon replied: "Because he didn't have anywhere else to go. I didn't give him any permission to live in the front house. He just moved in the front house." Melissa testified that Sharon and Winston never lived together in the same structure on the Vanowen property.

Sharon testified, there were "two reasons why [Winston] came over [to her home], he was supposed [to] take care of Melissa because I was going to be working . . . and the next reason was he was on parole, and [he] needed . . . an address so his parole officer could come and visit him." According to Melissa, although Winston was supposed to take care of her when Sharon was gone, "he wouldn't really. I stayed with my friends at the time." Sharon also testified that Winston "didn't" take care of Melissa when she was gone, stating: "[Melissa] had to move and go across the street . . . to her friend's house."

According to Winston, although he and Sharon planned to move into the back house together, because "it was so small" and "my daughter started to turn [into a] teenager," he gave Sharon and Melissa "the space" and he lived with Behmer in her house. According to Winston, "we still go from back [house] to front [house] and eat and drink from back to front just the same way. And she came over and sleep [in the front house] sometimes also." Winston testified that he and Sharon celebrated Christmas together, stating that "we [were] home and we cook[ed] and [ate] and all that." Winston also testified that he and Sharon did things together and people knew them as a couple. Winston

testified that, until September 2015, he and Sharon had a "loving relationship" and a "marital relationship."

D.   *Behmer Gifts the Vanowen Property to Sharon*

On July 16, 2008, Ms. Behmer gifted the Vanowen property to Sharon by quitclaim deed.  The deed was recorded on December 18, 2008.  Prior to 2010, Sharon obtained a loan and entered into a promissory note using the Vanowen property as collateral.   Sharon testified that she made the note payments and that "[Winston] didn't make payments on the [note] . . . because [at] that time we weren't together."  Sharon testified that Winston "never worked . . . never paid a bill."

Winston testified that he contributed to the promissory note payments from the funds he earned working as a handyman. Winston further testified that he worked as a caregiver for Behmer "and that's how Sharon's name got on the house." Winston testified that his name was not on the title to the property "because [he] didn't have proper [immigration] documents" to reside in the United States.  Behmer died in 2010.

E.   *Sharon Sells the Vanowen Property and Purchases the Woodcock Property*

On August 5, 2015, Sharon sold the Vanowen property to Deal Buys Corp.  The deed was recorded on October 2, 2015.  She used the sale proceeds to repay the promissory note and to fund the purchase of a new home at 11656 Woodcock Avenue in San Fernando.  Sharon also made a $2,000 down payment on the Woodcock property.

Sharon took title to the Woodcock property as a single woman and financed the balance of the purchase price with a loan evidenced by as promissory note and secured by a deed of trust on the property in her name alone.  Sharon moved to the

Woodcock property in September 2015. Winston did not move to the Woodcock property.

F.    *The $2,000 Down Payment for the Woodcock Property*

The parties dispute the source of the $2,000 down payment for the Woodcock property. However, they agreed that, at the time Sharon sold the Vanowen property and contracted to purchase the Woodcock property, Sharon obtained a loan of $2,500 using a vehicle as collateral. They also agreed that, although Winston "owned" the vehicle, title to the vehicle was in Princessa's name, and "a couple days before escrow was closed," Princessa transferred the vehicle's title to Sharon. Sharon then obtained the $2,500 loan.

According to Winston, because Sharon had to make a down payment on the Woodcock property before she received the Vanowen property sale proceeds, Sharon used $2,000 from the loan's proceeds as the initial down payment on the Woodcock property. Sharon denied using the loan proceeds to purchase the Woodcock property. Sharon testified that she gave the loan proceeds to Winston "for stuff that he bought for his store." Sharon testified that the "car loan . . . was all part of getting away from [Winston]" because Sharon "didn't want to make an enemy out of [Winston]." According to Sharon, she obtained the loan because she "feared" Winston. Sharon did not repay the loan, and the finance company repossessed the vehicle.

Winston testified that using his car as collateral was "the closest [he] can explain . . . that we [were] together, transacting all that." Winston explained to the trial court that he did not have documents to prove the parties did not separate until September 2015 "because [he] never used to take part in the paper transaction of business." Winston testified that he never

6

had any joint accounts with Sharon "because [he] never [had] proper documents for [living] here [in this country]."

G.     *Tax Issues and Storage Fees*

According to Sharon, while she was living with Winston before the domestic violence incident, she and Winston filed "joint" income tax returns. However, after she moved to the Vanowen property in early 2007, Sharon filed "single" tax returns listing her status as "head of household." Sharon later testified that, beginning in 2007 and continuing through the date of trial, she filed income tax returns listing her status as "married filing separately." After Sharon testified that they were true and correct copies, the trial court admitted into evidence Sharon's 2015 and 2016 income tax returns. On these returns, Sharon listed her filing status as "married filing separately." When asked if he had an objection to the returns being admitted in evidence, Winston responded that he did not believe that Sharon "filed separately." Winston never filed any tax returns.

Sharon asserted, then withdrew, a claim for reimbursement of taxes she paid. Sharon's counsel stated that Sharon "made a mistake" raising a tax reimbursement issue because the 2016 IRS levy for $18,951.43 was for the 2009 tax year. There were no other tax claims raised at trial.

Sharon sought to recover $2,064.87 she paid for a storage unit rental. She claimed that in 2015 the parties placed their belongings in a storage unit and that "[Winston] promised to make payments on one half [of the storage fees], and never did." Winston denied that there was an agreement to share the fees. Winston testified that the rental of the storage unit was "proof that we were still together with each other during all the sales of the house. I am moving her things. Moving my things."

H.    *The Trial Court's Rulings*

In its statement of decision, regarding Winston's credibility, the trial court found: "[Winston] is a convicted felon with multiple convictions including relating to possession of controlled substances with intent to sell, kidnapping and voluntary manslaughter.  [Winston] was found by the court to have little to no credibility on key issues relating to the date of separation and the two properties in dispute.  The court finds credible the testimony of [Sharon] that the primary source of [Winston's] 'earnings' during marriage and post-separation has been the illegal sale of drugs."

Regarding the date of separation, in ruling for Sharon, the trial court found:  "I do find that [Sharon's] explanation and testimony is more credible than [Winston's] on the issue of date of separation.  The date of separation in a marriage is not just reflective of whether or not you are living in the same place.  It is whether you are holding yourself out to people as a married couple, whether you consider yourself a married couple, whether you consider yourself in a romantic, loving, close relationship of husband and wife.  I don't believe that the evidence supports [Winston's] theory of the marriage.  The court believes that this is a marriage where even though they were living in close proximity, and I believe that [Sharon] is doing a lot to help [Winston] out.  But they were not living as husband and wife.  And the court will find that the date of separation is December 17, 2006."

In rejecting Winston's claims regarding the Vanowen property, the trial court ruled, "The court also considered the evidence submitted on the [Vanowen property].  The court finds that this property was transferred to [Sharon] post-separation in

8

a gift by Mary Behmer on 7/16/08.  Petitioner has failed to meet his burden of proving the community funds were used for the purchase of the Vanowen property or that any community funds were used to maintain or pay for expenses and taxes on the property.  Accordingly, the court finds that the Vanowen property is [Sharon's] sole and separate property with no reimbursement to [Winston]."

In also denying Winston's claims regarding the Woodcock property, the trial court ruled, "the court has considered the evidence submitted on the [Woodcock property].  The court finds that the down payment for the Woodcock property was purchased by [Sharon] after separation on 9/11/15 as a 'single woman.'  Accordingly the burden was on [Winston] to trace the funds used for the down payment.  [Winston] has failed to meet his burden of proving that community funds were used for the purchase[ ] of the Woodcock property or that any community funds were used to maintain or pay for expenses and taxes on the property.  Accordingly, the court finds that the Woodcock property is [Sharon's] sole and separate property with no reimbursements to [Winston]."

Denying Sharon's request for reimbursement of the storage fees, the trial court ruled:  "I have heard evidence from both sides.  And I do not find [Sharon's] testimony that she made an agreement with [Winston] to pay for half of the storage unit to be credible.  And therefore I'm going to deny [Sharon's] request for reimbursement on the storage unit."[2]

---

[2]     Although the trial court denied Sharon's claim for reimbursement of the storage fees, the judgment stated that Winston "shall be solely responsible for the cost of the storage

Although Sharon withdrew her tax reimbursement claim, the trial court ruled:  "Similarly, the court reserves jurisdiction over the issues of income tax liability.  Again, after multiple continuances, neither party brought in the documents necessary to establish the amount of tax liability as of the date of separation and how much, if any, has been paid since."[3]

Winston timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err in Finding the Date of Separation Was December 2006*

1.  *Applicable Law*

Family Code section 771 classifies property acquired after the "date of separation" as the acquiring spouse's separate property.[4]  As originally enacted, section 771 provided that "[t]he earnings and accumulations of a spouse . . ., while living separate and apart from the other spouse, are the separate property of the spouse."  (§ 771, former subd. (a).)  In 2016, the Legislature substituted the clause "after the date of separation of the spouses" for the clause "while living separate and apart from the other spouse.'"  (§ 771, subd. (a).)  At the same time, the Legislature defined "date of separation'" in a new section of the Family Code:  "'Date of separation' means the date that a

---

unit."  As Winston requests, we correct the trial court's error in the judgment.

[3]     Because Sharon withdrew the only tax claim presented at trial, as requested by Winston, we also correct the trial court's error in reserving jurisdiction in the judgment regarding tax liabilities.

[4]     Undesignated statutory references are to the Family Code.

10

complete and final break in the marital relationship has occurred, as evidenced by both of the following: [¶] (1) The spouse has expressed to the other spouse his or her intent to end the marriage. [¶] (2) The conduct of the spouse is consistent with his or her intent to end the marriage." (§ 70, subd. (a).) In enacting section 70, the Legislature expressly abrogated the holding in *In re Marriage of Davis* (2015) 61 Cal.4th 846 that "the Legislature intended the statutory phrase 'living separate and apart' to require both separate residences and accompanying demonstrated intent to end the marital relationship." (*Id.* at pp. 863–864; § 70, subd. (c).)

The "date of separation" definition added by section 70 is consistent with case law interpreting and applying former section 771. (*In re Marriage of Manfer* (2006) 144 Cal.App.4th 925, 928; *In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 451; *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 736.) In *In re Marriage of von der Nuell,* the court explained that a separation under section 771 "requires not only a parting of the ways with no present intention of resuming marital relations, but also, more importantly, conduct evidencing a complete and final break in the marital relationship." (*In re Marriage of von der Nuell*, at p. 736.) "'[T]he date of separation occurs when either of the parties *does not* intend to resume the marriage *and* his or her actions bespeak the finality of the marital relationship. There must be problems that have so impaired the marriage relationship that the legitimate objects of matrimony have been destroyed and there is no reasonable possibility of eliminating, correcting or resolving these problems.'" (*In re Marriage of Manfer*, at p. 930.)

"'The ultimate question to be decided in determining the

11

date of separation is whether either or both of the parties perceived the rift in their relationship as final. The best evidence of this is their words and actions. The husband's and the wife's subjective intents are to be objectively determined from all of the evidence reflecting the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final.'" (*Ibid.*, italics omitted; accord, *In re Marriage of Hardin, supra*, 38 Cal.App.4th at pp. 451-452.) Section 70, subdivision (b), provides: "In determining the date of separation, the court shall take into consideration all relevant evidence." (See *In re Hardin,* at p. 452 ["[a]ll factors bearing on either party's intentions 'to return or not to return to the other spouse' are to be considered"].)

### B. *Standard of Review*

"On appeal, we presume the judgment is correct. "'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown'" by the appellant." (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93-94; accord, *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) "'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]"' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.]" We may not reweigh the evidence and are bound by the trial court's credibility

12

determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.'" (*In re Marriage of Ciprari,* at p. 94; accord, *Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.)

"'The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.'" (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at p. 94; accord, *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.) "'The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.'" (*In re Marriage of Ciprari,* at p. 94; accord, *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380.) "'"Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision."'" (*In re Marriage of Ciprari,* at p. 94; accord, *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Here, Sharon testified that she permanently separated from Winston after he violently attacked her in December 2006. Sharon moved her residence to separate from Winston. Although Winston lived close by, Sharon perceived the rift in their marriage as final. According to Sharon and Melissa, Sharon never lived with Winston again. Sharon testified that, after December 2006 domestic violence incident, she did not have sexual relations with Winston, use the same bathroom as Winston, or eat a meal with Winston. Sharon testified that the

13

parties did not hold themselves out as a married couple.

Although Winston testified that he and Sharon had a "loving relationship" through September 2015 and did not separate until Sharon sold the Vanowen property, the trial court found Sharon's "explanation and testimony more credible than [Winston's]." Indeed, the trial court found Winston "to have little to no credibility on key issues relating to the date of separation." Winston does not address the trial court's adverse credibility findings. Rather, he recites his testimony supporting his September 2015 date of separation. However, "[w]e are 'not a second trier of fact.'" (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 391; see *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 ["'[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court'"]; *Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 393 [credibility is the exclusive province of the trier of fact]; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 ["'questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve'"]; *In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 162 ["[c]redibility is a matter within the trial court's discretion"].)

Under these circumstances, the trial court reasonably concluded that, even though Sharon was "doing a lot to help" Winston, "they were not living as husband and wife." Accordingly, substantial evidence supported the trial court's finding that the date of separation was December 17, 2006.

14

C.  *The Trial Court Did Not Err in Awarding the Vanowen and Woodcock Properties to Sharon Without Reimbursement to Winston*

    1.  *Applicable Law and Standards of Review*

        a.  *Characterization*

A spouse's time, skill, and labor are community assets and his or her earnings during marriage are community property, but "after the date of separation" earnings and accumulations of a spouse "are the separate property of the spouse." (§§ 760, 771, subd. (a).)  "The trial court must characterize the property for purposes of this division as separate, community, or quasi-community." (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 525-526; accord, *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 732; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 291.)  "The characterization of property as community or separate can be determined by the date of acquisition, the application and operations of presumptions, or by whether the spouses have transmuted the property." (*In re Marriage of Sivyer-Foley & Foley,* at p. 526; accord, *In re Marriage of Rossin*, at p. 732.)

    "'Perhaps the most basic characterization factor is the time when property is acquired in relation to the parties' marital status.'" (*In re Marriage of Rossin*, *supra*, 172 Cal.App.4th at p. 732; see *Marriage of Lehman* (1998) 18 Cal.4th 169, 177 ["[w]hat is determinative of characterization is . . . a single concrete fact−time"]; *In re Marriage of Buol* (1985) 39 Cal.3d 751, 757, ["'[t]he status of property as community or separate is normally determined at the time of its acquisition'"].)  "The character of the property as separate or community is fixed as of the time it is acquired; and the character so fixed continues until

15

it is changed in some manner recognized by law, as by agreement of the parties." (*In re Marriage of Rossin,* at p. 732.) "'Allegations . . . that legal title does not represent beneficial ownership have . . . been historically disfavored because society and the courts have a reluctance to tamper with duly executed instruments and documents of legal title.'" (*In re Marriage of Haines, supra,* at p. 294; accord, *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 489.)

"[W]e review the trial court's factual findings regarding the character and value of the parties' property under the substantial evidence standard." (*In re Marriage of Sivyer-Foley & Foley*, *supra*, 189 Cal.App.4th at p. 526; accord, *In re Marriage of Rossin*, *supra*, 172 Cal.App.4th at p. 734.) "''The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences.'''" (*In re Marriage of Klug* (2005) 130 Cal.App.4th 1389, 1398.) "But de novo review is appropriate where resolution of "'the issue of the characterization to be given (as separate or community property) . . . requires a critical consideration, in a factual context, of legal principles and their underlying values, [such that] the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.'''" (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 152; accord, *In re Marriage of Rossin, supra*, 172 Cal.App.4th at p. 734.) Although the court's factual findings are reviewed for substantial evidence, "[t]he trial court's selection of what legal principles to apply is subject to de novo review." (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584.)

b. *Reimbursement*

Section 2640, subdivision (c), provides: "A party shall be reimbursed for the party's separate property contributions to the acquisition of property of the other spouse's separate property estate *during the marriage . . . .*" (Italics added.) The party claiming a reimbursement has the burden of proving his or her entitlement to the reimbursement. (*In re Marriage Ciprari, supra*, 32 Cal.App.5th at p. 101; accord, *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057-1058.)

"On appeal from a determination of failure of proof at trial, the question for the reviewing court is ""whether the evidence compels a finding in favor of the appellant as a matter of law.""" (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769; accord, *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647; *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

""Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.""" (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270; accord, *Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 302-303.) "'Where, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him [or her] to prevail on appeal by arguing the evidence compels a judgment in his [or her] favor. That is because unless the trial court makes specific findings of fact in favor of the losing plaintiff, we presume the trial court found the plaintiff's evidence lacks sufficient weight and

17

credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence.'" (*Patricia A. Murray Dental Corp.,* at p. 270; accord, *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

### 2. *Vanowen Property*

Winston argues "that he was sole care giver of Ms. Behmen" and that Sharon's "name alone was always in their transactions because he was an undocumented alien." Therefore, the trial court's finding that the Vanowen property was Sharon's separate property "is clearly unsupported by a [*sic*] substantial evidence." Winston is incorrect. Substantial evidence supported the trial court's characterization of the Vanowen property as Sharon's separate property. The trial court's ruling was also legally sound.

Sharon acquired the Vanowen property two years after the date of separation. If "unrelated to the community," a spouse's acquisition of property after the date of separation is the acquiring spouse's separate property. (*In re Marriage of Stephenson* (1984) 162 Cal.App.3d 1057, 1085.) Winston has not shown any connection between the Vanowen property and the community. Given that the parties moved to the Vanowen property after the date of separation, any efforts Winston expended to care for Behmer were not the community's efforts. They were his separate efforts. (§ 771, subd. (a).) Therefore, the Vanowen property was Sharon's separate property. (*In re Marriage of Lee & Lin* (2019) 41 Cal.App.5th 698, 700-701 ["property acquired after the date of separation [is] the acquiring spouse's separate property"]; § 752 ["[e]xcept as otherwise

18

provided by statute, neither spouse has any interest in the separate property of the other"].)

Further, Evidence Code section 662 establishes that the "owner of the legal title to property is presumed to be the owner of the full beneficial title" and that "[t]his presumption" can be "rebutted only by clear and convincing proof." (See *In re Marriage of Haines, supra*, 33 Cal.App.4th at p. 297 ["[s]ection 662 establishes a rebuttable presumption in favor of title"]; see generally *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011 [clear and convincing standard of proof requires "substantial evidence from which a reasonable fact finder could find it highly probable that the fact was true"].) Winston failed to offer evidence of an agreement with Behmer or Sharon by which he was supposed to own the Vanowen property. Even accepting Winston's testimony that he cared for Behmer, there was no evidence that Behmer transferred the Vanowen property to Sharon because of his efforts; only Winston's conclusion that his efforts resulted in Behmer's transfer to Sharon. Winston failed to rebut the presumption of title. (See *In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 189 ["[t]he presumption [arising from the form of title] can be overcome only by evidence of an agreement or understanding between the parties that the title reflected in the deed is not what the parties intended"], disapproved on other grounds in *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1405; accord, *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 345; see generally *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012 [when reviewing the clear and convincing standard of proof, "the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated

the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence"].)

As the trial court reasonably found, the Vanowen property is Sharon's separate property. (*In re Marriage of Fossum*, *supra*, 192 Cal.App.4th at p. 344 ["Under the 'form of title' presumption, the description in a deed as to how title is held presumptively reflects the actual ownership status of the property. [Citation.] . . . Accordingly, absent a showing to the contrary, the status declared by the instrument through which a party acquired title will control"].)

As to Winston's claim for reimbursement for promissory note payments he allegedly made on the Vanowen property, Sharon denied that Winston made any such payments. Thus, Winston's evidence was not uncontradicted and unimpeached. Therefore, Winston did not meet his burden on appeal because the evidence does not compel a finding in his favor as a matter of law. (*Juen v. Alain Pinel Realtors, Inc., supra,* 32 Cal.App.5th at p. 978; *Almanor Lakeside Villas Owners Assn. v. Carson, supra,* 246 Cal.App.4th at p. 769.)

Finally, even if there was a factual basis for Winston having made note payments on the Vanowen property, he has not shown they were made with community funds. While Winston testified he worked as a handyman, the trial court found the "primary source of [Winston's] 'earnings' . . . post-separation has been the illegal sale of drugs." Whatever the source, he would have used his separate property earnings to make the note payments on Sharon's separate property after the date of separation. (§ 2640 [reimbursement for separate property contributions to the other party's separate property only "during the marriage"]; cf. § 2626 ["[t]he court has jurisdiction to order

20

reimbursement in cases it deems appropriate for debts paid after separation but before trial"].)

### 3. *Woodcock Property*

Winston contends that Sharon "took a car title loan on a community property car for $2,500 and put down $2,000 towards the down payment on the Woodcock house." Therefore, Winston contends "the Woodcock property clearly[ ] should have been found by the court to be community property." Winston's argument lacks merit.

Sharon purchased the Woodcock property over nine years after the date of separation with her separate property funds, the sale proceeds from the Vanowen property. Sharon also made a $2,000 down payment to purchase the property and took out a loan secured by a deed of trust on the property. Sharon holds title to the property. Winston maintained that Sharon used community property to purchase the Woodcock property because she obtained the $2,000 down payment from a "car title loan on a community property car." Sharon agreed that she obtained the $2,500 loan, but she testified that the loan had "nothing to do with the Woodcock property." The trial court found Sharon more credible than Winston. (See *In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319 [""""[t]he trier of fact is the sole judge of the credibility and weight of the evidence"""]; accord, *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099; see *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979 ["As the trier of fact in this case, the trial judge was the exclusive judge of the credibility of the evidence. [Citation.] In that role, the judge may reject any evidence as unworthy of credence, even uncontradicted testimony"].) Under the circumstances, because the uncontradicted and unimpeached evidence does not support

21

Winston's claim, Winston has not met his burden on appeal. (*Juen v. Alain Pinel Realtors, Inc., supra,* 32 Cal.App.5th at p. 978; *Almanor Lakeside Villas Owners Assn. v. Carson, supra,* 246 Cal.App.4th at p. 769.)

Accepting that the $2,500 vehicle title loan was the source of the $2,000 payment, Winston's claim also fails because there was no evidentiary foundation to support a community property car's involvement in the transaction. Although the parties agreed that Winston "owned" the vehicle, Winston does not cite to evidence showing that the vehicle was a "community property car." There was no evidence as to when he acquired the vehicle, the source of funds used to acquire the vehicle, or why the vehicle's title was in Princessa's name. Accordingly, the trial court reasonably concluded that Winston "failed to meet his burden of proving that community funds were used for the purchase[ ] of the Woodcock property or that any community funds were used to maintain or pay the expenses and taxes on the property."

### D. *The Trial Court Did Not Abuse Its Discretion in Admitting Sharon's Tax Returns*

Winston argues that the trial court erred in admitting into evidence Sharon's 2015 and 2016 tax returns because of "the glaring lack of foundation and authentication for said tax returns." We review a trial court's evidentiary rulings for abuse of discretion. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

Sharon offered the returns to show her "married filing separately" status for the 2015 and 2016 tax years. Based on Sharon's testimony that the returns were copies of her filed tax

returns, the trial court admitted the documents. Because Winston did not object to their admission, he forfeited the argument that the returns were not properly authenticated. (Evid. Code, § 353, subd. (a); *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563-565; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726; see also *In re Marriage of E. & Stephen P.* (2013) 213 Cal.App.4th 983, 991, disapproved on other grounds in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.)

Even if Winston did not forfeit the argument, a document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be (Evid. Code, § 1400). "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321; accord, *People v. Goldsmith* (2014) 59 Cal.4th 258, 267; *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1288-1289.) The trial court was within its discretion in admitting the documents.

Further, any error in admitting the documents was harmless because Winston cannot demonstrate prejudice. Sharon's credible testimony supported the December 2006 date of separation as did Melissa's testimony. The trial court found that Winston's testimony was not credible. (Evid. Code, § 353, subd. (b); *In re Marriage of Goddard* (2004) 33 Cal.4th 49, 56 ["the presumption in the California Constitution is that the 'improper admission or rejection of evidence . . .' is subject to harmless error analysis and must have resulted in a 'miscarriage of justice' in order for the judgment to be set aside. (Cal. Const., art. VI,

23

§ 13.)"]; *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 884 ["[p]rocedural defects which do not affect the substantial rights of the parties do not constitute reversible error"]; see also Code Civ. Proc., § 475 ["[t]he court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of the court, does not affect the substantial rights of the parties"].)

## DISPOSITION

The judgment is modified:  to delete the sentence, "The court reserves jurisdiction over income tax liability," on page two at paragraph 2(e), and correct the final sentence in the sixth paragraph on page two of the attachment to the judgment, so it states, "Sharon shall be solely responsible for the cost of the storage unit."  As modified, the judgment is affirmed.


DILLON, J.*


We concur:


PERLUSS, P. J.                    SEGAL, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.